Commonwealth v. Lao.

## COMMONWEALTH vs. AGAPITO LAO.

Suffolk. April 8, 2011. - June 13, 2011.

Present: IRELAND, C.J., SPINA, BOTSFORD, GANTS, & DUFFLY, JJ.

*Homicide. Evidence,* Hearsay, Spontaneous utterance, Disclosure of evidence, Cross-examination. *Witness,* Cross-examination. *Practice, Criminal,* Capital case, Hearsay, Mistrial, Witness, Disclosure of evidence, Argument by prosecutor, Instructions to jury.

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the admission of testimony from the defendant's daughter regarding whether the victim had told her what caused the defendant to try to run the victim over with his car, where, although the question was objectionable in that it called for speculation about the defendant's state of mind, the answer would have been admissible as an excited utterance in response to a properly phrased series of questions directed at the cause of the victim's crying and screaming at that moment; further, no error arose in testimony that indicated that the victim continued to be under the influence of the defendant's attempt to run her over when she spoke on the telephone with him. [16-17]

The judge at a murder trial did not abuse his discretion in denying the defendant's motion for a mistrial, or to strike the testimony of a witness who changed the basis of her testimony, where defense counsel cross-examined the witness effectively, and where the defendant failed to demonstrate how he was prejudiced by the late disclosure of the change in testimony [17-20]; likewise, no prejudice arose from the prosecutor's references to a "prior proceeding" or a "trial transcript" [20-21].

At a criminal trial, no substantial likelihood of a miscarriage of justice arose from the prosecutor's closing argument, in which he used a time-line chart, where his argument was grounded in the evidence and did not misrepresent any witness's testimony, and where the chalk served as a useful, nonprejudicial aid to jurors in understanding the argument, which referred to numerous approximations of times of day; further, the prosecutor did not diminish the reasonable doubt standard in asking the jury to apply their common sense. [21-22]

At a murder trial, the judge did not err in declining to give an instruction on the claimed inadequacy of the police investigation, where the judge's instructions on credibility and reasonable doubt were adequate and allowed the defendant the opportunity to present fully to the jury the issues of the absence of various tests and the failure to seize certain items of physical evidence [22-23]; further, there was no merit to the defendant's argument that the instruction on deliberate premeditation was erroneous [23].

INDICTMENT found and returned in the Superior Court Department on June 26, 2000.

Following review by this court, 443 Mass. 770 (2005), and 450 Mass. 215 (2007), the case was tried before *Charles T. Spurlock*, J.

*Stewart T. Graham, Jr.*, for the defendant.

*Paul B. Linn*, Assistant District Attorney (*Mark T. Lee*, Assistant District Attorney, with him) for the Commonwealth.

SPINA, J. The defendant appeals from his conviction of the deliberately premeditated murder of his estranged wife in May, 2000. He asserts error in (1) the admission of evidence of a conversation between the victim and their daughter that supplied motive for the murder; (2) the denial of his motion for a mistrial arising out of a witness's unanticipated change in her testimony, and the disclosure of the defendant's previous trial[1] during the Commonwealth's direct examination of the witness; (3) the prosecutor's use during closing argument of an erroneous timeline chart, and calling for a conviction on less than proof beyond a reasonable doubt; (4) the judge's refusal to give a socalled *Bowden* instruction, see *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980); and (5) a jury instruction that failed adequately to explain deliberate premeditation. We affirm the conviction and decline to reduce the degree of guilt or order a new trial pursuant to our power under G. L. c. 278, § 33E.

1. *Background.* The defendant and the victim had three children. They lived in an apartment in Chelsea. The defendant exerted considerable control over his wife. He would not allow her to have a driver's license, and he consistently denied visits by friends and relatives. He eavesdropped on her telephone conversations. They argued often, and he was physically abusive. One of their sons once heard the defendant threaten to kill the victim if she left him. The defendant and the victim had separated

---

[1] The defendant's first trial resulted in a conviction of deliberately premeditated murder that was affirmed on appeal. See *Commonwealth* v. *Lao*, 443 Mass. 770 (2005). He subsequently filed a motion for a new trial alleging that appellate counsel was ineffective for failing to raise challenges under the Sixth Amendment to the United States Constitution to certain statements admitted in evidence. The motion was denied, but we reversed and ordered a new trial. See *Commonwealth* v. *Lao*, 450 Mass. 215, 216-217 (2007).

for about one year before the murder, but he had continued his efforts to control her life. The victim kept their Chelsea apartment.

The victim began dating a man she had met three years before. He had moved to Brooklyn, New York, and she began to visit him there. They agreed he would move into her Chelsea apartment, which he did, on May 1, 2000.

On the evening of April 30, 2000, the victim and the defendant went out to dinner. Their daughter, who had been sleeping, was awakened by the sound of the victim screaming and crying as she returned home. She told her daughter that they went out to dinner because she wanted to tell the defendant she intended to file for divorce, and that her boy friend would be moving in the next day. She said the defendant had just tried to run her over with his car.

On May 1, the victim paged the defendant from a store and asked him to help her carry some groceries home. He arrived in a white van he used in his business as a self-employed contractor. He drove the victim to her apartment and helped her carry the groceries upstairs. That night, the victim's boy friend arrived at her apartment with his belongings.

At about 8 A.M. the next morning, May 2, the boy friend left to apply for a job. The victim was alive at the time. Between 8:30 and 8:55 A.M., two neighbors noticed a white van parked on the street near the victim's apartment building. Between 9 A.M. and 10 A.M., Jose Santiago, another tenant in the victim's apartment building, arrived there with his brother. A tire on his car was flat, and he walked to the rear of the apartment building to get some tools to fix the tire. The defendant, whom he knew, was walking down the driveway toward the street. Santiago greeted the defendant but received no response.

Santiago also encountered Francisco Guzman, the landlord, at the rear of the building. Guzman was working on a car. They talked for a few minutes. Santiago and Guzman both noticed that the back door to the building was open. Guzman had gone outside to work on his car sometime between 8:45 A.M. and 9:30 A.M. Just before he went out he heard a "dragging" sound coming from the master bedroom of the victim's apartment. He locked the back door of the building on his way out.

The victim's boy friend returned to the apartment sometime after 10 A.M. He found the victim, unresponsive, on her bed. He saw blood on her left side, and her neck was black. He promptly telephoned 911. Chelsea police were dispatched at 10:14 A.M.[2] The victim was transported by ambulance to a nearby hospital. She died on May 17, 2000, due to strangulation.

The defendant gave a statement to police on the afternoon of May 2, 2000. He said he had left his home at about 8 A.M. to buy a door at the South Bay Home Depot store for a client in Waltham. He then bought breakfast at a McDonald's restaurant near Meridian Street in the East Boston section of Boston. At about 9:15 A.M. he telephoned the victim to inquire about the results of a medical test he had undergone. He then drove to his client's home in Waltham via Routes 16 and 60, stopping for gasoline en route. He arrived at his client's home at about 10:30 A.M., where he worked until 2 P.M., installing the door.

Police investigated the defendant's potential alibi, confirming that he purchased a door at the South Bay Home Depot store at 8:50 A.M. on May 2, 2000. Police also confirmed that the defendant had installed a door at his client's home in Waltham on that day. Police determined that it would take about fifteen minutes to drive from the store to the McDonald's restaurant where the defendant said he bought breakfast, and about seven minutes to drive to the victim's apartment in Chelsea. That particular restaurant is not on a direct route from the Home Depot store to the client's Waltham home, and there are at least six other McDonald's restaurants on a direct route from the Home Depot store to the client's Waltham home. A State police lieutenant drove at "normal speed" from the McDonald's restaurant to the client's Waltham home, following the route indicated by the defendant. With a delay at a train crossing, the trip took forty-three minutes.

The sole defense witness, a tenant who lived at the Waltham home of the defendant's client, testified that she was awakened by construction noises at about 10:50 A.M. or 11 A.M. on May 2, 2000. She looked out her window and saw a white van. A postal supervisor who was monitoring the route of a letter carrier on

---

[2]Santiago saw police cars arrive at the apartment building about twenty to twenty-five minutes after he arrived.

that day, keeping detailed records, testified that the letter carrier began delivering mail at 10:35 A.M. on May 2, 2000, on the street in Waltham where the client's house was located. The letter carrier also testified. He estimated it takes about five minutes to reach the end of the street. Neither the supervisor nor the letter carrier heard any construction noise nor did they see a white van on the street that morning.

2. *Hearsay evidence.* The prosecutor asked the defendant's daughter if the victim told her on April 30, 2000, what "caused him to try to run her over" with his car. The defendant argues that this question called for testimony that was speculative as to the defendant's state of mind, and as such was objectionable. There was no objection, thus our review is under the standard of a substantial likelihood of a miscarriage of justice. See *Commonwealth v. Wright*, 411 Mass. 678, 681 (1992).

We agree with the defendant that the question was objectionable. It called for speculation about the defendant's state of mind. See *Commonwealth v. Millyan*, 399 Mass. 171, 183 (1987). However, the answer would have been admissible as an excited utterance in response to a properly phrased series of questions directed at the cause of the victim's crying and screaming at that moment. "The underlying exciting event may be proved by the excited utterance itself." *Commonwealth v. King*, 436 Mass. 252, 255 (2002). See Mass. G. Evid. § 803 (2) (2011). The underlying exciting event, the defendant's attempt to run over the victim after she told him she was filing for divorce and that her boy friend was moving in that night, was relevant evidence as to the defendant's motive to kill. There was no substantial likelihood of a miscarriage of justice.

After the daughter testified about the victim's explanation for her emotional state, the prosecutor asked her whether the victim then did something. She testified that the victim "paged [the defendant]." The prosecutor asked if there was a response to the page, to which the daughter testified the telephone rang, the victim answered the telephone and said to the defendant, "Why did you do that?" while she was "still crying hysterically, shaking, [and] screaming." There was no objection. The defendant contends that this was not an excited utterance. We disagree. The evidence indicated the victim continued to be under the

influence of the defendant's attempt to run her over, and the absence of any abatement of that excitement during the telephone call created an inference that she was indeed talking to the defendant. There was no error.

3. *Motion for a mistrial.* The defendant argues on appeal that it was error to deny his motion for a mistrial, or alternatively, to strike the testimony of a witness, the basis of whose testimony changed from that on which she was allowed to testify, and because the prosecutor's examination of the witness disclosed the fact of the defendant's prior trial.

The prosecutor notified defense counsel three days before trial was scheduled to begin that the daughter of Francisco Guzman, the landlord, had just disclosed for the first time to an agent of the Commonwealth, that she saw the defendant descending the back stairs from the victim's apartment on the morning of the murder. Defense counsel filed a motion for a continuance to investigate the accuracy of this information. He also requested a voir dire of the witness, which was conducted the day before trial commenced.

The witness testified at the voir dire that she met with the prosecutor and investigators three days before trial and told them something about the case she had not previously disclosed to anyone except to her twin brother some time after the defendant's original conviction. She disclosed that she saw the defendant coming down the back stairs from the victim's apartment on the morning of the murder. She said she had not previously disclosed this information because she was afraid. The judge denied the defendant's motion for a continuance.

At trial, the witness testified she was awakened on the morning of May 2, 2000, by the sound of loud banging noises, and the screaming and yelling of a woman coming from the victim's apartment, which was directly above her apartment.[3] After the noise stopped she opened the back door of her apartment and saw the defendant coming down the stairs. They made eye contact. Anticipating impeachment on the point, the prosecutor asked if she mentioned this to police at the time. She said she remembered mentioning it. The prosecutor himself then started

---

[3]This was generally consistent with her testimony at the first trial. See *Commonwealth* v. *Lao*, 443 Mass. 770, 772 (2005).

to impeach her with the transcript of her testimony in 2002, but he appears to have been distracted by a rapid series of side bar conferences and he did not resume what he set out to do.

At the end of the prosecutor's direct examination, defense counsel moved to strike the witness's testimony, or in the alternative, for a mistrial, arguing that he was faced with the difficulty of having to deal with the issue of a late disclosure by the witness that had evolved into a late disclosure by the *Commonwealth*,[4] as well as the difficulty he would have in cross-examining a witness who remembered little. He also complained that his only means of impeachment was the witness's prior recorded testimony from the defendant's first trial, the fact of which had become apparent by the prosecutor's efforts to impeach her. He stressed that any use of her prior recorded testimony would only emphasize the existence of the first trial. The motion to strike and the motion for a mistrial were denied.

Defense counsel cross-examined the witness effectively. He emphasized her failure to mention anything to her father, who was out in the yard at the time and at one point came into the apartment. He elicited testimony that underscored the presence of extensive gaps in her recollection of other details. He dwelled on her failure to telephone police. He emphasized that she was friendly with the victim and that she knew something about the victim's boy friend, but she had no recollection of details. Finally, he secured her admission that she had no recollection of what she told police on the day of the murder. He never impeached the witness with her prior testimony. In his closing argument he referred to her testimony essentially as preposterous, then pinned it on the Commonwealth with great effect by suggesting the prosecutor's theory of the case depended on that fanciful testimony.

In his closing argument the prosecutor tried to distance himself from the witness, describing her as anything but "[l]ikable, cooperative, exact and . . . nice." Continuing, he stated he had no idea "why she behaved the way she did from the witness stand . . . . And if you chose to dismiss her testimony outright,

---

[4]Defense counsel acknowledged that there was nothing in the police reports indicating the witness said she saw the defendant on the day of the murder. The judge indicated that counsel would have the opportunity to question police witnesses on the matter.

if you chose to say, 'I don't believe her, don't want her involved in any part of this case,' I can't really blame you."

Review of a decision denying a motion for a mistrial is for an abuse of discretion. See *Commonwealth* v. *Perez*, 405 Mass. 339, 345 n.8 (1989). "[T]he burden of demonstrating an abuse of discretion is a heavy one." *Commonwealth* v. *Medeiros*, 395 Mass. 336, 351 (1985). It requires a showing that "no conscientious judge, acting intelligently, could honestly have taken the view expressed by him." *Id.*, quoting *Commonwealth* v. *Bys*, 370 Mass. 350, 361 (1976).

It is important to state at the outset that the defendant does not claim that the Commonwealth goaded him into moving for a mistrial such that principles of double jeopardy might be implicated. See *Commonwealth* v. *Lam Hue To*, 391 Mass. 301, 311-312 (1984). Nor does the record suggest any such misconduct. There is nothing to show why the Commonwealth would have withheld evidence that an eyewitness had seen the defendant leaving the murder scene.

Similarly, to the extent that the late disclosure was the result of the witness's failure to disclose what she knew until three days before trial, and that the prosecutor then promptly provided defense counsel with her statement, there has been no showing of a violation of a discovery order by the Commonwealth. See *Commonwealth* v. *Ira I.*, 439 Mass. 805, 809-811 (2003). The defendant does not offer this as a basis for a mistrial.

The defendant's focus, instead, is on the "potential misconduct by the Commonwealth" when the witness testified at trial that she remembered telling police the day of the murder that she saw the defendant descending the back stairs from the victim's apartment. The problem with the defendant's position is that he has not shown that the witness did tell police on the day of the murder that she saw the defendant descending the back stairs. He acknowledges that there is only "potential" for this conclusion. The judge made no findings to this effect, and trial counsel (who is not appellate counsel) did not request a voir dire during the trial. Instead, he proceeded with his cross-examination and succeeded in obtaining a statement from the witness to the effect that she really had no recollection what she told police on that day.

Even if the witness in fact had told police that she saw the defendant inside the apartment building on the morning of the murder, he has not shown how he was prejudiced. The defendant correctly notes that although the witness's testimony was incriminating, it also was exculpatory. It was incriminating because she was the only witness who placed him inside the victim's apartment building near the time of the murder. It was exculpatory because the late disclosure was at variance with her previous statements and therefore provided a basis to challenge her credibility as a key Commonwealth witness. Whether the evidence was incriminating, exculpatory, or both, where, as here, there has been disclosure but no evidence of bad faith, the question becomes whether the defendant had sufficient time to adjust to the disclosure in shaping and preparing his defense. Stated another way, the defendant must show prejudice. See *Commonwealth* v. *Hamilton*, 426 Mass. 67, 70 (1997) (denial of motion for two-week continuance not abuse of discretion where defendant failed to show prejudice by late disclosure of inculpatory fingerprint evidence); *Commonwealth* v. *Vaughn*, 32 Mass. App. Ct. 435, 441-443 (1992) (abuse of discretion in denial of mistrial where defendant demonstrated that more time was needed to develop defense fully after late disclosure of exculpatory evidence).

Despite his assertion that the late disclosure provided him no time to adjust his trial strategy, the defendant has shown no prejudice. The defense was alibi, which defense counsel announced in his opening statement, saying, "This case is a case about a door and a clock. Nothing more." Although the landlord's daughter placed him inside the victim's apartment building on the morning of the murder, defense counsel had thoroughly discredited her and jeopardized the Commonwealth's credibility in the process. He essentially transformed the inculpatory aspect of her testimony into its full exculpatory value, driving the prosecutor to embark on the extremely unusual tactic of disavowing the witness's entire testimony. If there was even a possibility of error, which we doubt, there certainly was no prejudice to his alibi defense from the late disclosure of the testimony of this witness.

The defendant further argues that he was entitled to a mistrial

because the prosecutor referred to a "prior proceeding" (four times) and a "trial transcript" (once) when questioning the witness, and because the prosecutor and the witness each referred to her testimony at a prior occasion "[a]t court" (once). This is not a case like *Commonwealth* v. *Arsenault*, 361 Mass. 287, 299-300 (1972), where numerous references to a "prior proceeding," together with the statement of a witness who met the defendant in prison, gave rise to an inference that the defendant had been tried previously and convicted. There was no evidence the defendant was in prison. There was nothing intentional about these few references and they appear to have been used by the prosecutor out of frustration over the witness's unresponsiveness. No curative instruction was requested, suggesting that experienced defense counsel's evaluation was to call no further attention to the references in question. We conclude that there was no prejudice, see *Commonwealth* v. *Qualls*, 440 Mass. 576, 583-584 (2003), and that the judge did not abuse his discretion in denying the motion for a mistrial.

Because the witness's testimony as to her observations of the defendant inside the apartment building on the morning of the murder was admissible, and because there was nothing objectionable about the questions soliciting that testimony, there was no error in denying the motion to strike.

4. *Prosecutor's closing argument*. The defendant contends that he is entitled to a new trial because the prosecutor's closing argument and his use of a time-line chart during closing argument to address the defendant's alibi were misleading, and he called for a conviction based not on proof beyond a reasonable doubt, but on common sense. Although defense counsel objected to the use of the chart, the basis for the objection was that he had not seen it before. He made no objection to the prosecutor's closing argument itself. Consequently, the issue of the propriety of the prosecutor's closing argument is unpreserved, and we review to determine whether any error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992).

A prosecutor is "entitled to marshal the evidence and suggest inferences that the jury may draw from it." *Commonwealth* v. *Drayton*, 386 Mass. 39, 52 (1982). Inferences need not be in-

escapable, just reasonable and possible. *Commonwealth* v. *Marquetty*, 416 Mass. 445, 452 (1993). A prosecutor may not "misstate the evidence or refer to facts not in evidence." *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 (1987).

The prosecutor's argument was grounded in the evidence and we are satisfied that he did not misrepresent any witness's testimony. The thrust of his argument simply was that after considering the variety of ranges and estimates of times contained in the testimony of the witnesses, there was a window of time from 9:24 to 9:52 A.M. on May 2, 2000, that was unaccounted for in the defendant's statement to police during which he could have committed the murder. In short, his alibi was not air tight. The prosecutor made it clear to the jury that not all the testimony of the witnesses fit neatly into his analysis, but those differences could be explained as human error.[5] He told the jury he was "using conservative numbers" and he was "not trying to stretch anything." He then said, "If there is something about what I'm saying that's unreasonable, then dismiss it. You don't have to take my word for it." The argument was both fair and reasonable, and the absence of any objection from experienced defense counsel suggests there was nothing unfairly prejudicial. See *Commonwealth* v. *Toro*, 395 Mass. 354, 360 (1985).

The time-line chart was nothing more than a chalk. It served as a useful, nonprejudicial aid to jurors in understanding the prosecutor's closing argument, which referred to numerous approximations of times of day. There has been no showing that it was an inaccurate reflection of that closing argument. See *Commonwealth* v. *Guy*, 454 Mass. 440, 446 (2009).

Finally, the prosecutor did not ask the jury to apply a "common sense" burden of proof rather than "proof beyond a reasonable doubt." His request that the jury apply their common sense was proper, and did not diminish the reasonable doubt standard. See *Commonwealth* v. *Cook*, 419 Mass. 192, 202-203 (1994).

We conclude that the prosecutor's closing argument was not improper.

5. Bowden *instruction*. The defendant asserts error in the judge's

---

[5]He essentially argued, for example, that the two witnesses who saw the defendant's van in front of the victim's home, at a time when he was at the Home Depot store, were mistaken as to time.

refusal to give an instruction that reflected the rule of *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980) (*Bowden*). As we have stated on many occasions, "a judge is not required to instruct on the claimed inadequacy of a police investigation. '*Bowden* simply holds that a judge may not remove the issue from the jury's consideration.'" *Commonwealth* v. *Boateng*, 438 Mass. 498, 507 (2003), quoting *Commonwealth* v. *O'Brien*, 432 Mass. 578, 590 (2000). See *Commonwealth* v. *Avila*, 454 Mass. 744, 767 (2009); *Commonwealth* v. *Williams*, 439 Mass. 678, 687 (2003).

The defendant's reliance on Federal cases is misplaced. See, e.g., *United States* v. *Whitney*, 524 F.3d 134, 138-139 (1st Cir. 2008). *Bowden* does not create a "defense" in the sense that it creates an element of proof that the Commonwealth must prove or disprove beyond a reasonable doubt, such that a particular instruction is required. *Bowden* merely recognizes that a defendant is entitled to present evidence that "certain tests were not conducted or certain police procedures not followed [that] could raise a reasonable doubt as to the defendant's guilt in the minds of the jurors." *Bowden*, *supra* at 486. Defense counsel presented such evidence, and he argued the absence of various tests and the failure to seize certain items of physical evidence as matters demonstrating inadequacies of the investigation. He did what *Bowden* permitted him to do, but *Bowden* requires nothing more. The judge's instructions on credibility and reasonable doubt were adequate, and they allowed the defendant the opportunity to present fully this factual issue to the jury. There was no error.

6. *Deliberate premeditation instruction.* There is no merit to the argument that the instruction on deliberate premeditation was erroneous. The judge delivered the approved instruction from the Model Jury Instructions on Homicide 7-10 (1999). The instruction that the defendant now contends, for the first time on appeal, should have been given, has been rejected recently in *Commonwealth* v. *Nardi*, 452 Mass. 379, 397-398 (2008). There was no error.

7. *G. L. c. 278, § 33E.* We have reviewed the entire record, the briefs, and the arguments, and see no reason to reduce the degree of guilt or order a new trial.

*Judgment affirmed.*