NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11855

COMMONWEALTH  vs.  DAVID J. KAEPPELER.


Barnstable.      September 9, 2015. - December 30, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, & Hines,
JJ.


Search and Seizure, Emergency, Consent, Plain view.  Practice,
    Criminal, Instructions to jury, Request for jury
    instructions.


    Indictments found and returned in the Superior Court
Department on April 15, 2011.

    A pretrial motion to suppress evidence was heard by Gary A.
Nickerson, J., and the cases were tried before him.

    The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


    Robert L. Sheketoff for the defendant.
    Julia K. Holler, Assistant District Attorney, for the
Commonwealth.


    HINES, J.  After a jury trial in the Superior Court, the

defendant, David J. Kaeppeler, was convicted of rape, G. L.

c. 265, § 22 (b); drugging for sexual intercourse, G. L. c. 272,

§ 3; and drugging to confine, G. L. c. 265, § 26B.[1]  The

convictions were based on events that occurred during a party at

the defendant's home in the early morning hours of May 21, 2010.

Two of the guests became seriously ill after ingesting tequila

supplied by the defendant.  After learning that the defendant

might also be ill, the police entered the defendant's home to

perform a well-being check under the "emergency aid" exception

to the warrant requirement of the Fourth Amendment to the United

States Constitution and art. 14 of the Massachusetts Declaration

of Rights.  While there, the police seized two tequila bottles,

one of which was later found to contain 1, 4-Butanediol, which

when ingested is converted into gamma-hydroxy butyric acid

(GHB), a so-called "date rape" drug.

In this appeal, the defendant challenges the denial of a

motion to suppress the two tequila bottles seized during the

well-being check.  We conclude that the police had objectively

reasonable grounds to believe that the defendant may have been

injured or in need of immediate medical assistance but that the

seizure of the evidence was unreasonable for two reasons:  (1)

the seizure occurred after the defendant departed for the

hospital in an ambulance and while the police remained in his

---

[1] The grand jury also returned indictments for distribution of a class E substance, G. L. c. 94C, § 32D (a), and illegal possession of a class E substance, G. L. c. 94C, § 34.  The Commonwealth filed a request for nolle prosequi as to each of these indictments prior to trial.

home without his consent; and (2) the police retained the evidence for investigative purposes without verifying its relevance to the emergency justifying their entry into the defendant's home.  Therefore, the motion to suppress should have been allowed.  The defendant also claims error in the trial judge's failure to instruct the jury in accordance with Commonwealth v. Bowden, 379 Mass. 472 (1980).  We reject the defendant's Bowden claim but remand for a new trial because of the error in the denial of the motion to suppress.

Background.  We recite the facts the jury could have found, reserving certain details for the discussion of the judge's ruling on the motion to suppress.  On May 20, 2012, the defendant and the victims -- John Smith[2] and Elana Thomas, both in their mid-twenties -- spent the evening drinking and dancing at a nightclub in Hyannis.  They were joined by Jerry Laramay, Daniel Bernard Cammerata, and Patricia S. Sweet.  That evening, the nightclub was inaugurating its first "gay and lesbian night," to which Cammerata had been invited to participate as the guest disc jockey.  Cammerata drove to Hyannis from Boston for the event with Sweet, his roommate.  His boy friend at the time, Laramay, and Laramay's roommate, Thomas, drove down separately from Boston.  At some point during the evening, Cammerata invited Smith, a local friend from Yarmouth, to come

---

[2] A pseudonym.

to the nightclub. Smith did so and performed as a dancer that night. Cammerata was acquainted with the defendant as a regular customer at another bar where Cammerata had worked. Smith had met the defendant twice before that night. Neither Thomas nor Laramay had previously met the defendant. Thomas and Smith danced together and appeared to "hit it off" with each other. The defendant made passes at Laramay, who rejected his advances and explained that he was in a dating relationship with Cammerata. When the club closed, the group decided to continue the celebration. The defendant offered his home, and the group accepted his invitation.

When the group arrived at the defendant's home, he served shots of tequila to everyone. After several hours, Cammerata, Sweet, and Laramay left to spend the night at Cammerata's mother's house. Smith inquired whether he and Thomas could stay at the defendant's house. The defendant agreed, and Cammerata, Laramay, and Sweet left, promising to return later that morning to pick up Smith and Thomas. The defendant then served another shot of tequila for him, Smith, and Thomas.

After 10 A.M. the following morning, Cammerata and Laramay returned to the defendant's house to pick up Thomas and Smith. They knocked at the door, but no one responded. Eventually, they were able to let themselves into the house through a patio door. When they entered, they observed Smith and Thomas

sleeping on sofas in the living room.  They managed to awaken Smith, but Thomas could not be roused.  Cammerata and Laramay carried Thomas to Laramay's vehicle with the intention of driving on to Boston.  Laramay became concerned, however, and decided instead to take Thomas to Cape Cod Hospital.

Smith left in Cammerata's vehicle for a ride home, and during the ride, Smith told Cammerata that he had a dream in which the defendant was giving Smith a "blow job" while he slept.  Smith testified that he phrased the statement as having a dream because he "couldn't believe what had happened" and he "wanted someone to tell [him] that that couldn't have happened." Smith testified that he had "[n]o doubt" that it had happened, and that he had pushed the defendant off of him, said "no," and turned over and went back to sleep after he was woken by the defendant's actions.  After arriving at home, Smith became ill and was taken to Cape Cod Hospital at approximately 8 P.M.

Medical staff at the hospital learned that Thomas and Smith had both been drinking at the defendant's house and recognized that both presented with similar symptoms -- unconsciousness and trouble breathing -- that could be associated with a drug overdose.  The hospital staff tested for several types of drugs but did not test for GHB because the results from the test could not be available in sufficient time to assist with medical care. The staff suspected, however, that GHB could be the cause after

ruling out a series of other possible causes. The victims' condition deteriorated at the hospital and both were transported, at separate times, by helicopter to Boston for medical treatment. The treating physicians in Boston conducted "everything that [was] possible" in terms of toxicology screens. Without positive results from any of those tests and with information provided by Laramay that he "tast[ed] something funny in the [tequila shared with the two patients]," the physicians concluded that the symptoms displayed by Thomas and Smith were caused by the ingestion of GHB and alcohol.[3]

At or around 9:15 P.M. that evening, hospital staff requested the Barnstable police to perform a well-being check on the defendant at his home because he too might be at risk for illness after drinking tequila with the two patients. At the defendant's home, the police obtained two bottles of tequila. One bottle was empty and in the garage; the other had liquid remaining and was on the kitchen counter. Although the bottle from the garage tested negative for GHB, the bottle from the kitchen counter tested positive for 1, 4-Butanediol, a drug that is converted by the body into GHB.

Discussion. 1. Motion to suppress. Prior to trial, the

---

[3] The treating physician in Boston testified that the symptoms of severe coma, vomiting, inflammation in the lungs, and difficulty breathing, together with the negative results from the other tests, guided their conclusion.

defendant filed a motion to suppress the tequila bottles seized during the warrantless entry into his home. The judge denied the motion, ruling that the seizure was reasonably related to the objective emergency of the undiagnosed illness of Smith and Thomas and the unknown status of the defendant's well-being. The defendant argues that the judge erred in denying the motion because the emergency justifying the warrantless entry, a check on his well-being, had ended by the time that the police seized the tequila bottles.

We summarize the facts as found by the judge, supplementing them as necessary with evidence in the record that is uncontroverted and that was implicitly credited by the judge. See Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008). Shortly after 10 P.M., Officer Paul J. Everson and Sergeant Kevin Tynan of the Barnstable police department arrived at the defendant's home to perform the well-being check. The police learned from hospital staff that Thomas and Smith had suffered symptoms that could be the result of a drug overdose and had been drinking with the defendant at a nightclub and at the defendant's house. The officers were also told that the defendant had not appeared at his workplace that day. The police knocked repeatedly before the defendant appeared at the door, looking as if he had just been awakened from sleep. After being told of the two individuals at the

hospital, the defendant invited the officers into the home. Officer Everson asked the defendant how he was feeling; the defendant responded that he was not feeling well and had been sleeping a lot.  Sergeant Tynan asked whether there was any GHB at the defendant's house or that could have been put in their drinks at the nightclub.  The defendant told the officers that he did not have any drugs in the home and did not think that GHB could have been put in their drinks.  He said that he was familiar with GHB and recognized the dangers of mixing it with alcohol.

In response to the officers' urging, the defendant agreed to go to the hospital, and an ambulance transport was arranged. Sergeant Tynan asked the defendant where the tequila was located, and the defendant told him that they had been drinking from a tequila bottle that was on the kitchen counter.  The bottle was visible from the officers' location.  The defendant also alerted the officers to the second tequila bottle in the garage.  Sergeant Tynan confirmed the second tequila bottle was in the garage, but did not pick up either bottle at that time.

When the ambulance arrived, Officer Everson accompanied the defendant to the hospital.  Sergeant Tynan remained in the house.  At Sergeant Tynan's request, an evidence collection officer from the Barnstable County sheriff's office arrived and photographed and collected the tequila bottles.  The bottles

were not tested until several months later, on September 6, 2010, in connection with this pending criminal case.

In reviewing the grant or denial of a motion to suppress, "we accept the judge's findings of fact and will not disturb them absent clear error." Commonwealth v. Tremblay, 460 Mass. 199, 205 (2011). However, we undertake "an independent determination as to the correctness of the judge's application of constitutional principles to the facts as found." Id. We begin the analysis with the well-settled principle that a warrantless search or seizure is presumptively unreasonable under the Fourth Amendment and art. 14, and may be justified only by a few "specifically established and well-delineated exceptions." Arizona v. Gant, 556 U.S. 332, 338 (2009), quoting Katz v. United States, 389 U.S. 347, 357 (1967). See Commonwealth v. Tyree, 455 Mass. 676, 683 (2010). Although the exceptions for exigent circumstances -- consent and plain view -- are implicated in the judge's findings of fact, the judge reviewed the search under the emergency exception to the warrant requirement. We consider each exception and conclude that none justifies the seizure of the tequila bottles.

a. Emergency exception. The well-established rule is that the presumption of unreasonableness of a warrantless search yields if "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is

objectively reasonable under the Fourth Amendment" (citation omitted). Mincey v. Arizona, 437 U.S. 385, 393-394 (1978). "The need to protect or preserve life or avoid serious injury is [one such] justification for what would be otherwise illegal absent an exigency or emergency." Id. at 392, quoting Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir.), cert. denied, 375 U.S. 860 (1963). Under the "emergency aid" exception, the police may "enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Brigham City v. Stuart, 547 U.S. 398, 403 (2006). See Commonwealth v. Entwistle, 463 Mass. 205, 213 (2012), cert. denied, 133 S. Ct. 945 (2013).

A warrantless search or seizure undertaken on this basis passes constitutional muster, however, only if (1) the police had an objectively reasonable ground to believe that an emergency existed; and (2) the conduct of the police after the entry was reasonable under all the circumstances. See Arizona v. Hicks, 480 U.S. 321, 325 (1987); Mincey, 437 U.S. at 393-394; Commonwealth v. McDermott, 448 Mass. 750, 766-767, cert. denied, 552 U.S. 910 (2007). The Commonwealth bears the burden of demonstrating that, taking into account the totality of the circumstances, the search and seizure fit within this exception to the warrant requirement. Thompson v. Louisiana, 469 U.S. 17, 19-21 (1984); Commonwealth v. Peters, 453 Mass. 818, 823 (2009).

"[T]he standards as to exigency are strict." Tyree, 455 Mass. at 684, quoting Commonwealth v. Forde, 367 Mass. 798, 800 (1975).

 i. Existence of objectively reasonable emergency. As a threshold matter, we agree with the judge's ruling that the police were presented with an objective emergency justifying the warrantless entry into the defendant's home. The police received reliable information from hospital staff that two individuals who had been with the defendant at a nightclub and at the defendant's home the prior evening were seriously ill and that, after being treated at the hospital, one victim was at that time being transported to a Boston hospital for further treatment. The request from the hospital staff, together with a report from a concerned coworker that the defendant had not appeared at work that day, established the urgency regarding the defendant's safety and presented an emergency warranting police intervention for that purpose. See Commonwealth v. Snell, 428 Mass. 766, 773, cert. denied, 527 U.S. 1010 (1999) (urgency created by, among other things, information that victim not heard from in days). In addition, except for the seizure of the tequila bottles, the police conduct after arriving at the defendant's home was focused entirely on the concern for the defendant's well-being. As the judge found, the police, on arrival at the defendant's home, "strongly urged that [the

defendant] get checked out at the hospital." The defendant

agreed to do so and accepted the ambulance transport arranged by

the police. Accordingly, the actions of the police up to the

point that the defendant was transported to the hospital were

consistent with the emergency aid exception.[4] See id. at 774,

quoting Commonwealth v. Bates, 28 Mass. App. Ct. 217, 219 (1990)

("purpose of the police entry [under emergency exception] is not

to gather evidence of criminal activity but rather, because of

an emergency, to respond to an immediate need for assistance for

the protection of life or property").

ii. Reasonableness of police conduct. Having concluded

that the police were justified in entering the defendant's home

under the emergency aid exception, we turn to the second prong

of the exception: whether the conduct of the police following

the warrantless entry was reasonable under the circumstances.

The defendant challenges the seizure of the tequila bottles,

arguing that it was not reasonably related to the purpose of a

check on his well-being.

"Reasonableness must be 'evaluated in relation to the scene

as it could appear to the officers at the time, not as it may

---

[4] This case does not present the question whether the police may make an emergency entry to provide assistance to a person not then present in the home. Although we do not decide the issue, our ruling does not foreclose the possibility that police may make a warrantless entry for the purpose of providing emergency assistance to a person not actually present.

seem to a scholar after the event with the benefit of leisured retrospective analysis.'" Commonwealth v. Townsend, 453 Mass. 413, 425-426 (2009), quoting Commonwealth v. Young, 382 Mass. 448, 456 (1981). See Commonwealth v. Porter P., 456 Mass. 254, 270 (2010) ("We evaluate the reasonableness of a police officer's conduct based on the information available to him at the time, not on what we later learn to be true"). Reasonableness, in turn, is informed by the well-settled rule that a "warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" Mincey, 437 U.S. at 393, quoting Terry v. Ohio, 392 U.S. 1, 25-26 (1968).

Applying this test to the police conduct at issue here, we conclude that the continued police presence in the defendant's home without his consent[5] after he was transported to the hospital for medical treatment and the subsequent seizure of the tequila bottles was unreasonable. First, the exigency justifying the warrantless entry to check on the defendant's well-being had ended before the seizure occurred. As established by the judge's findings, the defendant presented himself to the police as having been awakened from sleep and perhaps tired, but not in any apparent distress. In addition, he agreed to be transported to the hospital as a precaution. From that point on, the police had no further cause for concern

---

[5] See part 1.b, infra.

about the defendant's well-being and no public safety justification to remain in his home. See Peters, 453 Mass. at 824-825 (no justification for protective sweep where emergency had ended).

In addressing reasonableness, we attach significance to the judge's finding that "[n]o one from the hospital staff had requested the bottles be seized" and that the deputy sheriff maintained custody of the bottles for approximately four months before they were sent to a laboratory for analysis with respect to the pending criminal case. Thus, the seizure of the tequila bottles, lacking any demonstrable relationship to the emergency, was more consistent with an investigative purpose. As such, it crossed the reasonableness threshold and cannot be sustained as conduct properly within the scope of the emergency exception. Cf. McDermott, 448 Mass. at 767 (conduct reasonable in context of emergency entry to search for other possible murder victims where police "looked only in places where a person could be found, they did not pick up or remove any items, and they remained for only a short time").

If the police, after lawfully entering the defendant's home, had seized the bottles in order to determine if the tequila contained a chemical or other contaminant that made the three people ill, the seizure might have been reasonable under the emergency aid exception. We need not, however, decide

whether those circumstances would have rendered the seizure reasonable, because no such intent was shown. Sergeant Tynan testified at the hearing on the motion to suppress that the bottles were seized because the officers "didn't know the status of the two people at the hospital" and they had information that the tequila was "the only thing [the patients] had consumed in that house at that time the night before." While the motion judge did not make any findings regarding the purpose of the seizure, he noted at the evidentiary hearing that Sergeant Tynan's statement about the purpose of the seizure was ambiguous and that the sergeant was never asked whether police took the bottles to aid in treatment or for proof of drugging. It is undisputed that the bottles were not submitted for immediate testing to determine the cause of the illness, and the Commonwealth, bearing the burden to show that the emergency aid exception was satisfied, presented insufficient evidence to support a finding that the bottles were seized in order to determine the cause of the illness. See Peters, 453 Mass. at 823.

When, as here, the police seize evidence after the exigency has ended, suppression of that evidence is proper. In Commonwealth v. Lewin (No.1), 407 Mass. 617, 626-628 (1990), we held that evidence seized in the defendant's apartment after the protective sweep had been completed should have been suppressed

because the search was unconstitutional after the emergency had ended. The same rationale applies here.

The decision in Commonwealth v. McCarthy, 71 Mass. App. Ct. 591 (2008), on which the Commonwealth relies, does not dictate a contrary result. While the defendant in McCarthy was unconscious in a restaurant and was being attended by emergency medical personnel, a police officer searched her open purse, which contained evidence that she possessed controlled substances. The court validated the search. Id. at 593. We distinguish McCarthy on several grounds. First, the warrantless search did not occur in a home; it occurred in a public place that is not accorded the broad presumption of unreasonableness that applies in the warrantless search of a home. See Commonwealth v. Krisco Corp., 421 Mass. 37, 44-45 (1995). Second, the defendant was in obvious distress and in need of immediate medical attention. The attending medical personnel expressed a specific concern that the defendant might be suffering a drug overdose that might possibly be verified by a search of the purse. Considering these facts, the exigencies of the situation justified the police in searching the purse.

We recognize that the role of a police officer responding to an emergency is not necessarily limited to rendering aid to an injured person. "[T]he role of a [police] officer includes preventing violence and restoring order, not simply rendering

first aid to casualties." Michigan v. Fisher, 558 U.S. 45, 49 (2009), quoting Brigham City, 547 U.S. at 406. However, the seizure of the tequila bottles was not necessitated by the kind of compelling safety concerns confronting the police in Fisher, supra. There, the police, responding to a report of a disturbance, confronted a chaotic scene with an injured person and an enraged defendant threatening further harm. Id. at 48. The ongoing events at the scene justified a law enforcement response to prevent further injury. Here, the police officers responding to the defendant's home for the well-being check faced no such threats to public safety. Thus, although the facts of this case do not present the need to parse the limits of the police response to an ongoing emergency, we are satisfied that the limitation we now impose on police conduct during a warrantless entry into a home will not undermine the ability of the police to respond to an emergency where the risk of harm or injury is ongoing and apparent.

b. Other exceptions. We address briefly the exceptions for consent and plain view. Although the defendant consented to the police presence in his home for the purpose of a well-being check on his condition, the consent ended when the defendant left in an ambulance for the hospital. "[A] search with consent is reasonable and legal only to the extent that the individual has consented." Commonwealth v. Cantalupo, 380 Mass. 173, 178

(1980). The police officers did not ask the defendant to consent to the seizure of the tequila bottles or to Sergeant Tynan remaining in the home after the defendant had left; nor did the defendant say or do anything that reasonably could be interpreted to constitute such consent. Thus, we see no basis to validate the seizure as a product of the defendant's consent to the police entry into his home to perform a check on his well-being. Similarly, the tequila bottles could not lawfully be seized under the plain view doctrine because, at that time, their "incriminating character" was not "immediately apparent." Commonwealth v. D'Amour, 428 Mass. 725, 730 (1999), quoting Commonwealth v. Santana, 420 Mass. 205, 211 (1995). When the seizure occurred, the medical condition of the two victims was of unknown cause, there was no evidence that they had been victims of a crime, and it was not known that the contents of a tequila bottle would explain their medical condition. With no more than a hunch that the tequila bottles contained the drug GHB, the police could not have seized the tequila bottles under the plain view doctrine for investigatory purposes. See Commonwealth v. King, 389 Mass. 233, 243-244 (1983) (permissible investigatory inquiry terminated when emergency concern satisfied). Cf. Commonwealth v. Marchione, 384 Mass. 8, 11-12 (1981) (plain view seizure of gasoline near homemade incendiary device permissible after emergency entry with reasonable cause

to believe gasoline was evidence of crime).

2.  Bowden instruction.  The defendant argues that the judge erred in declining to instruct the jury in accordance with Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980).  Citing Mathews v. United States, 485 U.S. 58, 63 (1988), he claims that the decision whether to give the instruction cannot be a matter of discretion because it is required as a matter of due process when properly requested.  The defendant requested the instruction in the charge conference following the close of evidence; therefore, we review the claim for prejudicial error.  See Commonwealth v. Prater, 431 Mass. 86, 97 (2000).

We discern no error, let alone prejudicial error, in the judge's denial of the defendant's request for a Bowden instruction.  Our cases are consistent in interpreting Bowden to mean only that the defendant is entitled to offer in evidence facts tending to establish that "certain tests were not conducted or certain police procedures not followed [that] could raise a reasonable doubt as to the defendant's guilt in the minds of the jurors."  Bowden, 379 Mass. at 486.  See Commonwealth v. Lao, 460 Mass. 12, 23 (2011) (no error in denying Bowden instruction where defendant permitted to argue faulty investigation); Williams, 439 Mass. at 687 ("the giving of [a Bowden] instruction is never required").

Accepting for the sake of argument the defendant's claim

that he is entitled, on due process grounds, to an instruction on his "defense" to the charge, there was no error here because lapses in the police investigation do not constitute a "defense" as that term is understood in our criminal jurisprudence.  We said as much in Lao, supra, where we stated that "Bowden does not create a 'defense' in the sense that it creates an element of proof that the Commonwealth must prove or disprove beyond a reasonable doubt."

Conclusion.  The defendant's Bowden claim lacks merit. Therefore, we decline to grant relief on that ground.  As to the motion to suppress, the order denying the motion is reversed for the reasons explained above.  The judgments of conviction are vacated, and the defendant is to be granted a new trial.

So ordered.

CORDY, J. (dissenting). "We all see something different in the bottom of a tequila bottle. Such is life." The motion judge's erudite observations, made during the motion to suppress hearing about the Barnstable police officers' actions at the defendant's home, likewise ring true with regard to the emergency exception to the warrant requirement. It is because the court sees the emergency exception too narrowly as a reprieve from the warrant requirement that I respectfully dissent.

There are two particular points made by the court with which I disagree. The first point is that the officers, on arriving at the defendant's home, were responding only to a potential emergency with regard to the defendant. In my view, the motion judge was correct in concluding that the emergency also applied to the ongoing and life-threatening state of the two patients, one at Cape Cod Hospital and one being "med-flighted" to Boston, and this case therefore does present the question whether the police may make an emergency entry to provide assistance to a person not in the home. I would hold that they may, and were, in this case, justified in doing so. Second, I disagree that the exigency to which the officers responded ended as soon as the defendant left his home for the hospital. Because I would hold that the emergency was ongoing, both for the defendant and the patients, the officers'

subsequent seizure of the tequila bottles was objectively reasonable under the circumstances.  It is for these reasons that I agree with the motion judge that the officers' actions fit squarely within the emergency exception, and I would hold that the motion to suppress was appropriately denied.

1.  Discussion.  "When reviewing a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error, but independently review the judge's ultimate findings and conclusions of law" (quotations omitted).  Commonwealth v. Jewett, 471 Mass. 624, 628 (2015).  Where there has been an evidentiary hearing, "we defer to the credibility findings of the judge, who had the opportunity to observe and evaluate the witnesses as they testified."  Commonwealth v. Peters, 453 Mass. 818, 823 (2009).

The Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights provide that the right of individuals to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated.  Warrantless searches and seizures inside of a home are presumptively unreasonable.  See, e.g., Brigham City v. Stuart, 547 U.S. 398, 403 (2006); Commonwealth v. Townsend, 453 Mass. 413, 425 (2009).  Such warrantless searches may only be justified in "specifically established and well-delineated exceptions" (quotation omitted).  Arizona v. Gant,

556 U.S. 332, 338 (2009).  One such exception exists in circumstances where the police reasonably believe that a search is required to deal with a life-threatening emergency.  See Mincey v. Arizona, 437 U.S. 385, 393-394 (1978).

The emergency exception "applies when the purpose of the police entry is not to gather evidence of criminal activity but rather, because of an emergency, to respond to an immediate need for assistance for the protection of life" (quotation omitted).  Commonwealth v. Snell, 428 Mass. 766, 774, cert. denied, 527 U.S. 1010 (1999).  "The reason is plain:  People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process" (quotation omitted).  Commonwealth v. Ringgard, 71 Mass. App. Ct. 197, 201 (2008).  Two strict requirements must be met before applying the exception:  (1) the officers must have had objectively reasonable grounds to believe that an emergency existed; and (2) the conduct of the police after the entry must have been reasonable under all the circumstances.  See Commonwealth v. McDermott, 448 Mass. 750, 766-767 (2007).  The exception allows the police, with an objectively reasonable basis for concluding that an emergency exists, to be proactive, as "an officer is not like a boxing . . . referee, poised to stop a bout only if it becomes too one-sided."  Brigham City, 547 U.S. at 406.  I fear that the court's reading of the emergency exception may, in many

life-threatening instances, relegate the Commonwealth to spectator status.

a. Scope of emergency exception. The court limits the scope of its analysis of the emergency exception to its application to the defendant, ignoring, contrary to the findings of the motion judge, the plight (known to the responding officers) of the two patients at Cape Cod Hospital. Our consideration of the emergency exception should apply in equal measure to the defendant and to the patients. Despite the court's assertions to the contrary, the evidence presented throughout the motion to suppress hearing fully supports the motion judge's ultimate findings that the officers entered the defendant's home "out of concern for the well being of the defendant and the two hospitalized individuals."

In its restricted view of the motion judge's findings, the court declines to address the emergency exception's application to warrantless entries for the purpose of providing emergency assistance to a person not actually present in the home. I would hold that the patients' not being within the defendant's home does not vitiate the basis for a warrantless entry and seizure on their behalf. Although the United States Supreme Court has not directly addressed the issue, its recent jurisprudence on the emergency exception to the warrant requirement is instructive.

The Supreme Court has had three instances to address the emergency exception to the warrant requirement: Mincey, supra;[1] Brigham City, supra;[2] and Michigan v. Fisher, 558 U.S. 45 (2009).[3] In each of those opinions, the Supreme Court draws from Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir. 1963), for the premise of the emergency exception that "[t]he need to

---

[1] An undercover police officer was shot in an apartment. Mincey v. Arizona, 437 U.S. 385, 387 (1978). Other officers rushed to his aid. Id. at 387-388. Minutes later, homicide detectives arrived and took charge of the investigation. Id. at 388-389. They aided in the removal of the suspects, and then conducted a search that lasted four days. Id. The United States Supreme Court held that "the Fourth Amendment [to the United States Constitution] does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." Id. at 392. The Supreme Court, however, refused to apply the emergency exception to the homicide detectives' search and seizure because all dangerous suspects had been removed prior to the arrival of the homicide officers. Id. at 393.

[2] Officers arrived at a home in response to a complaint of a loud party. Brigham City v. Stuart, 547 U.S. 398, 400-401 (2006). The police observed an altercation in the home between four adults and a juvenile. Id. at 401. The Supreme Court, in concluding that the subsequent warrantless entry into the home was reasonable, expanded the definition of the emergency exception, holding that the police officers' subjective intent upon entering the dwelling is irrelevant. Id. at 404-405.

[3] A police officer, after responding to a report of a disturbance, encountered signs of recent injury. Michigan v. Fisher, 558 U.S. 45, 48 (2009). The officer could see violence inside, including the defendant throwing projectiles at an unobserved target. Id. The Supreme Court held that it was objectively reasonable for the officer to enter the home, further expanding the exception by observing that it would be "error . . . to replace . . . objective inquiry into appearances with . . . hindsight determination that there was in fact no emergency." Id. at 49.

protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."  See Fisher, 558 U.S. at 47, quoting Brigham City, 547 U.S. at 403; Mincey, 437 U.S. at 392.  Each of these cases presents a situation in which the purported emergency relates to an individual within the home to be searched by the police.  They are not, for that reason, factually analogous to our case.  However, the Court's reasoning allows for an interpretation of the emergency exception that would apply whenever officers have objectively reasonable grounds to believe an emergency resonates from otherwise protected private property, whether it be related to aiding an injured person, preventing a shooting, extinguishing a fire, defusing a bomb, or ascertaining the cause of a life-threatening illness.  See Wayne, supra.  See also 3 W.R. LaFave, Search and Seizure § 6.6(a), at 619 (5th ed. 2012) ("[e]ntry may be justified even though the endangered persons are not in the premises").

Case law around the country and within the Commonwealth supports this view, as victims and would be threats, be they attackers or latent poisons, are frequently not in the same place.[4]  It is an unnecessary requirement that they be so; a

---

[4] See, e.g., Armijo ex rel. Armijo Sanchez v. Peterson, 601 F.3d 1065, 1071 (10th Cir. 2010), cert. denied, 562 U.S. 1224

requirement that compromises public safety and hampers law enforcement in fulfilling the purpose for which the emergency exception exists. See Fisher, 558 U.S. at 49, quoting Brigham City, 547 U.S. at 406 ("role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties"). Consequently, the motion judge did not err in concluding that the officers were seizing the bottles in response to an emergency that encompassed both the condition of the defendant who was being taken to the hospital and the condition of the patients who were already there.

---

(2011) (holding that "the exigent circumstances exception permits warrantless home entries when officers reasonably believe that some actor or object in a house may immediately cause harm to persons or property not in or near the house" [emphasis in original]); Mora v. Gaithersburg, 519 F.3d 216, 225-226 (4th Cir. 2008) (placing search of home of detained man who had threatened his coworkers squarely within emergency exception, despite his not being home, as "[t]he authority to defuse a threat in an emergency necessarily includes the authority to conduct searches aimed at uncovering the threat's scope"); United States v. Mayes, 670 F.2d 126, 127-128 (9th Cir. 1982) (allowing search of home for object that had been blocking child's throat, though child was in hospital under care of doctor when search and seizure of object took place); United States v. Moskow, 588 F.2d 882, 892 (3d Cir. 1978) (entry into vacant building with strong odor of gasoline held to be legal, as of "primary concern to the police was the safety of the occupants of neighboring buildings"); Richardson v. State, 247 So. 2d 296, 298 (Fla. 1971) (affirming denial of motion to suppress when police had been searching defendant's home with purpose of aiding doctors to save lives of six children then at hospital being treated for symptoms of ingested poison). See also Commonwealth v. McCarthy, 71 Mass. App. Ct. 591, 594-595 (2008) (denying motion to suppress evidence found in defendant's handbag when officer believed it may have contained cause for her overdose).

b.  Reasonableness of the seizure.  The court again limits its analysis to whether the police were objectively reasonable in seizing the tequila bottles in response to only the defendant's emergency.  Because I agree with the motion judge that the emergency exception also applied to -- and likewise was triggered by -- the patients' emergency in the hospital, our analysis should consider both.  In any event, whether it be applied to the defendant, the patients, or both, the police acted objectively reasonably under the circumstances in seizing the bottles.

In determining whether exigent circumstances exist, we "evaluate the circumstances as they would have appeared to prudent, cautious, and trained officers" (quotation omitted). Armijo ex rel. Armijo Sanchez v. Peterson, 601 F.3d 1065, 1071 (10th Cir. 2010), cert. denied, 562 U.S. 1224 (2011).  See Commonwealth v. Hall, 366 Mass. 790, 803 n.16 (1975).  "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action. . . . The officer's subjective motivation is irrelevant" (emphasis in original; citation omitted).  Brigham City, 547 U.S. at 404. See Commonwealth v. Entwistle, 463 Mass. 205, 214 (2012), cert. denied, 133 S. Ct. 945 (2013).  Reasonableness is to be "evaluated in relation to the scene as it could appear to the

officers <u>at the time</u>, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis" (emphasis added; quotation omitted). <u>McDermott</u>, 448 Mass. at 766. See <u>Commonwealth</u> v. <u>McCarthy</u>, 71 Mass. App. Ct. 591, 594 (2008) (indicating that reviewing court evaluates police action in its context and "not with twenty-twenty hindsight"). "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." <u>Fisher</u>, 558 U.S. at 49. See <u>Entwistle</u>, <u>supra</u> at 214. It is commonly accepted that a "drug overdose is a serious medical emergency, often resulting in death when the afflicted person is not given timely and proper treatment." <u>McCarthy</u>, <u>supra</u>.

According to the motion judge's findings, when the officers entered the defendant's home, their knowledge of the ongoing situation was minimal. They were aware that two individuals were in critical condition under the care of emergency room staff, and that one of them had been "med-flighted" to a Boston hospital. The defendant told them that he had been feeling ill all day, as well. Finally, in speaking with the defendant, the officers ascertained that the only thing that all three ill individuals had potentially shared was the tequila.

At that moment, the police officers, in evaluating all the circumstances, were justified in seizing the bottles. This is a situation in which there is more than just the mere existence of

a potentially harmful circumstance.  See Commonwealth v.

Kirschner, 67 Mass. App. Ct. 836, 841-842 (2006).  A timely

medical response, namely the defendant leaving in an ambulance

and the patients already being present in the hospital, did not

obviate the need for intervention, as the presence of -- and

treatment by -- medical personnel does not necessarily render an

emergency over.  See McCarthy, 71 Mass. App. Ct. at 594-595

(denying motion to suppress evidence when officer searched bag

of unconscious woman, despite presence of emergency medical

technicians).[5]  Moreover, the information relayed from the

---

[5] The court distinguishes McCarthy on two grounds.  In that
case, an officer responded to reports of an unconscious woman.
McCarthy, 71 Mass. App. Ct. at 592.  The officer called for the
assistance of an emergency medical technician (EMT).  Id.  The
EMT began to administer treatment, noted that the woman was
suffering from an overdose, and asked the officer if he knew
what the woman had taken.  Id.  The officer then searched the
woman's handbag.  Id. at 593.  The court first asserts that the
case is distinguishable because the defendant in McCarthy was in
a public place, rendering her reasonable expectation of privacy
less than if she had been in her home.  Ante at    .  I find
this argument to be inapposite.  While it is true that an
individual's expectation of privacy is less in public places,
see Commonwealth v. Blood, 400 Mass. 61, 68-69 (1987), one's
expectation of privacy remains paramount with regard to personal
effects.  Had the officer in McCarthy been able to see the
contents of the defendant's purse simply by looking, this would,
of course, not offend the defendant's expectation of privacy.
But when the officer searched the handbag, he was still
searching her personal effects, and an exception to the warrant
requirement was necessary.  In that case, as I would find in
this one, the emergency exception provided grounds for that
search.  Next, the court argues that McCarthy is different
because "the defendant [in McCarthy] was in obvious distress and
in need of immediate medical attention."  Ante at    .
Moreover, the court finds, the "attending medical personnel

hospital tended to show that the emergency was getting worse; as the police knew it, there was reason to believe that the patients' situation may have been deteriorating. It was objectively reasonable to believe that the defendant's health could also have deteriorated even after going to the hospital. The officers were therefore justified in seizing the tequila bottles pointed out to them by the defendant with the goal of aiding in either the patients' or the defendant's recovery.

The court's focus on the treatment of the bottles after their seizure is misplaced. Whether the testing of the contents of the bottles was subsequently necessary for the diagnosis and treatment of the patients is irrelevant, and based on decisions made by others rather than the responding officers who made the decision to seize the bottles. Considering subsequent events as determinative of reasonableness is precisely the type of

---

expressed a specific concern that the defendant might be suffering from a drug overdose that might possibly be verified by a search of the purse." Id. The record, though, shows only that the EMT asked the officer whether he knew what the defendant had taken. McCarthy, supra at 594. To distinguish these cases, and thus allow a search in McCarthy but not in the present case, would be to split hairs. The officer in McCarthy and the officers in the present case knew overdose was a potential cause for the sickness. They also knew that the attending medical personnel had been unable to ascertain the cause of such an overdose, and the officers in each scenario acted in what they believed was a reasonable response to the situation. The only difference is that the EMT in McCarthy asked the officer if he knew what the defendant had taken. That is not enough to distinguish these cases.

hindsight second-guessing that other courts have decried.[6]  It is equally baseless to obligate, as would the court, a request from medical staff before an officer can act in what might otherwise amount to a life-threatening emergency.

2.  <u>Conclusion</u>.  When the officers arrived at the defendant's home, they had no reason to believe that the defendant was in any way criminally responsible for the patients' medical condition.  Further, there is no evidentiary basis upon which to conclude that the hospital was aware of circumstances that might lead to an arrest for the crime with which the defendant was ultimately charged.  This inquiry is, however, in the end, unimportant.  Even if the officers had reason to suspect the defendant was responsible for the patients' illnesses, the officers' subjective intent in

_____

[6] Attributing an investigative analysis to the officer's actions in seizing the bottles based on something that occurred after the seizure amounts exactly to the "leisured retrospective analysis" we aim to avoid.  See <u>Commonwealth</u> v. <u>McDermott</u>, 448 Mass. 750, 766, cert. denied, 552 U.S. 910 (2007).  Indeed, I would hold that, even had the officers learned, just moments after the bottles were seized, that the patients and the defendant were cleared medically, the purpose in seizing and holding the bottles would still have been reasonably in response to the ongoing emergency.  Regardless, even if one were to attach importance to the eventual use of the bottles in the criminal prosecution of the defendant, the motion judge did "not infer an investigative motive on the part of [the officers] from the fact that [they] had an evidence collection officer summonsed to the scene.  Local police departments in Barnstable County routinely use the services of the [s]heriff's [o]ffice to assist in documenting all manner of police work, including non-criminal events such as traffic accidents."

retrieving the tequila bottles is irrelevant.  Rather, the only important question is whether it was objectively reasonable to believe an emergency existed justifying the seizure of the tequila bottles.  I agree with the motion judge's findings and conclusion that there were sufficient grounds to believe that the bottles, from which all three ill individuals had been drinking the night before, were relevant in addressing what objectively appeared to be a life-threatening emergency, both as to the defendant, and as to the patients already at the hospital.  Such a seizure, therefore, was plainly reasonable under the circumstances.

For these reasons, I respectfully dissent.