NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13318

COMMONWEALTH  vs.  MICHAEL SCHOENER.


Norfolk.     January 4, 2023. - April 18, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.


Kidnapping.  Accessory and Principal.  Evidence, Accomplice,
    Intent, Hearsay, State of mind, Verbal completeness.
    Intent.  Practice, Criminal, Instructions to jury, Judicial
    discretion, Hearsay.



Indictment found and returned in the Superior Court
Department on August 5, 2014.

The case was tried before Robert C. Cosgrove, J., and a
motion for postconviction relief was heard by him.

The Supreme Judicial Court granted an application for
direct appellate review.


Erin R. Opperman for the defendant.
Pamela Alford, Assistant District Attorney, for the
Commonwealth.


GEORGES, J.  In the months leading up to New Year's Day,

2014, the defendant, Michael Schoener, then a Dedham police

officer, provided several specific items to his drug supplier,

James Feeney, at Feeney's request.  These items included the board of probation (BOP) records and driver's license information of the victim, James Robertson, as well as the defendant's Dedham police badge, gun holster, and handcuffs.  After having done so, the defendant continued his relationship as a regular purchaser of Percocet pills from Feeney.  Feeney provided the victim's information and the defendant's items to his associates, Scott Morrison and Alfred Ricci.  As instructed by Feeney, Morrison and Ricci used the police equipment and their knowledge of the victim's personal information to impersonate law enforcement officers and to convince the victim that they were at his house to take him to complete a mandatory drug test.[1]  They handcuffed the victim and drove him to Ricci's garage, where they shackled him to a chair.  Feeney directed Ricci and Morrison to leave the garage; later that night, Feeney called Ricci and Morrison to help him dispose of the victim's body.  One year later, the victim's remains were found in a nearby wooded area.

The defendant was charged and convicted of being an accessory before the fact to kidnapping, G. L. c. 265, § 26.  Feeney, Morrison, and Ricci were charged with kidnapping and murder in the first degree, among other charges.  On appeal, the

---

[1] The victim was on probation and was required to take mandatory drug tests; Feeney was aware of this requirement.

defendant argues that there was insufficient evidence to prove that he knew that Feeney would use the items he provided to kidnap the victim or that he intended the kidnapping to happen. Accordingly, we must address in this case what constitutes sufficient evidence of knowledge and intent to support a conviction of accomplice liability to kidnapping. The defendant also argues that there were numerous errors in the judge's instruction on the elements of accessory to kidnapping. In addition, the defendant contends that his statements in his August 6, 2014, interview with police, following his indictment, should have been admissible to impeach the testifying officer.

We conclude that the evidence was sufficient for a jury to find beyond a reasonable doubt that the defendant knowingly participated in the kidnapping by providing the items to Feeney and, in so doing, shared Feeney's intent that the kidnapping take place. We reach this determination in part based on the specific items provided by the defendant -- his police badge, gun holster, and handcuffs -- and their nexus to the elements of kidnapping. We also conclude that the judge's instructions to the jury were not erroneous. Moreover, there was no abuse of discretion in the judge's decision to exclude the defendant's August 6 statements. Accordingly, we affirm the defendant's conviction and the order denying his motion for postconviction relief.

1. <u>Background</u>.  We recite the facts in the light most favorable to the Commonwealth.  See <u>Commonwealth</u> v. <u>Kostka</u>, 489 Mass. 399, 400 (2022).  A conviction may rest exclusively on circumstantial evidence, and in evaluating that evidence, we draw all reasonable inferences in favor of the Commonwealth. <u>Commonwealth</u> v. <u>Rakes</u>, 478 Mass. 22, 32 (2017).

a. <u>Events prior to the kidnapping</u>.  By the summer of 2013, the defendant had been purchasing Percocet from Feeney for almost two years.  The defendant had been introduced to Feeney through a mutual friend, who also had sold Percocet to the defendant; eventually, the defendant switched to purchasing Percocet directly from Feeney.  At that time, the defendant had been a patrol officer in the Dedham police department for eight years.  His patrol officer's uniform included four badges -- one wallet badge, and three that he wore on his hat, shirt, and jacket -- and two sets of handcuffs.

During the period from 2013 into 2014, the defendant went to Feeney's Dedham apartment approximately two to three times each week to purchase Percocet pills.  On average, he spent approximately $300 per week for about ten pills.  The defendant spent roughly fifteen minutes with Feeney during each visit.  On some occasions, the defendant was wearing his police uniform pants when he came to make the purchase.

In the summer of 2013, the defendant had learned from Feeney that there was a "love triangle" between Feeney, Andrea Morse, and the victim. Morse had known Feeney since 2005, and the two commenced a romantic relationship shortly before Morse met the victim in 2013. On separate occasions, Feeney spoke to the defendant about his animosity towards the victim and referred to the victim as a "drunken piece of shit." The defendant had seen Morse at Feeney's apartment. Additionally, on at least one occasion while he was at Feeney's apartment, the defendant briefly met Ricci, who was Feeney's cousin, and Morrison.

At trial, Morse testified that at one point during the summer of 2013, the victim, while intoxicated, drove to Feeney's apartment and then attempted to break into Feeney's car, but inadvertently broke into someone else's vehicle and was arrested. Feeney was very angry at the victim for coming to his house, and he believed that the victim had been there to assault him. The victim was incarcerated briefly and then released on probation. Feeney knew that, as a condition of his probation, the victim was required to undergo drug testing.

Later that summer, Morse and the victim went to the Dedham police station to retrieve Morse's impounded car. The defendant was on duty, and Morse recalled that he looked "very nervous" at the sight of the two. Morse believed this was because the

defendant recognized her from Feeney's apartment. The defendant mentioned to Feeney that he had seen the victim and Morse at the police station when they were picking up Morse's impounded vehicle.

On separate occasions in the summer and fall of 2013, Feeney requested that the defendant check the license plate numbers of drivers who, among other things, Feeney thought had "cut him off on the highway"; the defendant did as requested. As a police officer, the defendant had the ability to check BOP records and license plate numbers.

After the victim's arrest, Feeney requested the victim's BOP record and license information, including a photograph. When the defendant asked Feeney why he wanted the information, Feeney replied that he had heard that the victim had been incarcerated and wanted to know why. Feeney did not explain why he wanted the license information or the photograph. Sometime after Thanksgiving 2013, Feeney gave the defendant fifteen Percocet pills as a "Christmas gift."

At some point between Thanksgiving and Christmas, Feeney asked to borrow the defendant's police badge, handcuffs, and holster. During a later interview with State police Trooper Bruce Tobin and Lieutenant Gerard Mattaliano, the defendant said that he did not ask Feeney why he wanted the items, because he wanted to keep their relationship friendly. In his testimony

before the grand jury investigating the victim's disappearance, when the defendant was asked why he thought that Feeney wanted his police badge, he responded:

> "I mean, I didn't really question it.  I just said, what do you need it for.  At first I was taken aback, you know.  He goes, Oh, I just want to use it.  And so me being naïve, I guess, I just gave it to him."

When the defendant was asked why he thought Feeney wanted his handcuffs, the defendant said, "I think he just implied that it might have been, I didn't really ask him.  I thought they were for his girlfriend or something, you know."  Even though he thought that Feeney already owned handcuffs, the defendant gave the handcuffs to Feeney. When Feeney asked for the holster, the defendant explained that he thought that Feeney "was just kind of like joking about it, you know.  I mean, I didn't, I wasn't thinking right. . . .  I was addicted to pills so I just was trying to keep my avenues of getting those open, I guess, and I wasn't thinking right."

The defendant brought the items to Feeney the next time that he was at Feeney's apartment, a few days before New Year's Day 2014.  Feeney did not mention his purpose in requesting them and did not mention the victim.  The defendant explained before the grand jury that Feeney "said he wasn't going to do, you know.  He just didn't really

imply anything, so I didn't.  I just wasn't thinking."  The defendant added that he did not receive anything, such as Percocet pills or money, for allowing Feeney the use of the equipment, but that he gave Feeney the items in an attempt to protect his means for purchasing Percocet pills.

At some point prior to January 1, 2014, appearing "disturbed," Feeney had mentioned to Ricci that Morse had chosen the victim over Feeney.  "A couple months before" January 1, 2014, Feeney approached Ricci and Morrison about posing as law enforcement officers so they could pick the victim up and bring him to Feeney, who said that he wanted to talk to the victim. During the month of December 2013, Feeney discussed this plan with increasing frequency; he told Ricci that he was "getting stuff together."  Feeney then showed Ricci a folder containing the victim's BOP record and his registry of motor vehicles (RMV) photograph that Feeney said he had obtained from his "cousin." Feeney told Ricci that the police query was part of the plan and showed Ricci a badge, a gun, a set of handcuffs, and a nightstick, all of which he said he also had obtained from his cousin.  Feeney subsequently told Ricci and Morrison that they were to go to the victim's house, show him a badge, a gun, his BOP record, and his RMV photograph, and then handcuff him as if they were transporting him to the office where he met his probation officer, but instead bring him to Ricci's garage.

Ricci testified that Feeney only discussed the plan with him and Morrison. Ricci did not speak with, call, or send text messages to the defendant, and the defendant never communicated with Ricci.

b. <u>The kidnapping</u>. On January 1, 2014, Morse dropped off the victim at his parents' house at around 11:30 <u>A</u>.<u>M</u>. Morse then called Feeney to let him know where the victim was. Morrison received a telephone call from Feeney to go get the victim, in the manner that Feeney had described. Morrison and Ricci drove to the victim's parent's house and parked across the driveway. Ricci testified that he and Morrison were dressed as "probation officer[s] or constable[s]." Morrison had a police badge on his belt and a gun in a holster, and he was holding handcuffs in one hand and a folder with the defendant's records in the other. Ricci also was carrying a gun and wearing a badge.

The victim briefly went outside, came back into the house, and told his parents that he had to go with the "constables" who were outside in order to take a random drug test. When the victim's father asked how the victim knew that the men were constables, the victim said that they looked official, had the correct documents with his name and photograph, and were wearing police badges. Returning outside, the victim asked Morrison where they were going, and Morrison replied that they were going

to Dedham.  Ricci and Morrison then handcuffed the victim, who got into the rear seat of their vehicle.  The victim's family never heard from him again.

Ricci and Morrison brought the victim to Ricci's house and shackled him to a chair in the garage.  Feeney told Ricci and Morrison to leave the garage.  At some point later that day, after Ricci and Morrison left, Feeney killed the victim.  Later that night, Feeney then drove Ricci and Morrison to a wooded area and directed them to dispose of the victim's body a few hundred feet into the woods.

Earlier, at 3:31 P.M, Feeney had called the defendant; the call went to voicemail.  The defendant then drove to Feeney's apartment, and Feeney returned the handcuffs, badge, and holster.  The items were in the same condition as they had been when Feeney took them.  Feeney made no mention of what he had done with them.

c.  Events after the kidnapping.  Following the return of his police equipment, the defendant continued to stay in contact with Feeney in order to purchase pills.  At some point, the defendant saw the victim on a missing persons poster at the Dedham police station.  The poster had a description of two suspects it said had impersonated constables.  That evening, the defendant called Feeney and asked him several times whether he had had anything to do with the disappearance.  Feeney said

repeatedly that "someone beat [him] to it."  The defendant later told Tobin and Mattaliano, and testified before the grand jury, that he did not inquire further because he "didn't want to be involved."

On February 27, 2014, following Feeney's arrest for drug distribution, police executed a search warrant for his apartment.[2]  The police found several firearms, including a pistol, and a bag containing handcuffs, zip-ties, and a police baton.  The police baton and the packaging for the zip ties tested positive for the presence of blood.  Deoxyribonucleic acid (DNA) testing indicated that the alternate major DNA profile in the blood "matched" the victim's DNA profile.  The items that the defendant had lent to Feeney tested negative for the presence of blood.

Also on February 27, 2014, Lieutenant David McSweeney and Trooper Brian Tully, who were investigating the disappearance of the victim, contacted the defendant after they learned that his telephone number appeared in Feeney's cell phone records.  When McSweeney and Tully told the defendant that they were investigating a missing person, he responded, "Is this about Feeney?"  The defendant said that he knew there was a missing

---

[2] The search was paused so that police could obtain a search warrant for Feeney's apartment to search for evidence related to the victim's disappearance.  Once the additional warrant was obtained, police resumed the search.

person who had dated Feeney's girlfriend.  He also told the officers that he had asked Feeney about the victim and that he did not think Feeney had had anything to do with the disappearance, or was capable of kidnapping the victim.  This belief was based in part on the defendant's understanding that Feeney used a wheelchair and was unable to walk.

On July 24, 2014, the defendant was interviewed by Tobin and Mattaliano,[3] immediately prior to his testimony to the grand jury that was investigating the victim's disappearance.  The defendant told the officers that he had purchased Percocet pills several times a week at Feeney's apartment and that he had obtained a motor vehicle crash report and checked a vehicle registration through RMV records.  The defendant described what he knew of the animosity between Feeney and the victim and explained that, after he saw a photograph of the victim on a missing persons poster at the police station, he had asked Feeney whether Feeney had had anything to do with the victim's disappearance, and Feeney repeatedly had denied any involvement.

That same day, the defendant testified before the grand jury investigating the victim's disappearance concerning his knowledge of that disappearance.  Before testifying, the

---

[3] At the beginning of the conversation on July 24, 2014, the defendant signed a Miranda waiver form.  At that point, no indictment had issued against him.

defendant was advised of his right to counsel and his right to remain silent.  At trial, Tobin testified to the substance of his conversation with the defendant on July 24, 2014, and the defendant's grand jury testimony was read in evidence.

On August 5, 2014, the grand jury returned an indictment charging the defendant with one count of being an accessory before the fact to the kidnapping of the victim; the indictment was dated July 31, 2014.  Tobin and Mattaliano interviewed the defendant again on August 6, 2014.  At the beginning of the interview, the officers informed the defendant that he had been indicted and a warrant had been issued for his arrest.  The defendant agreed to waive his Miranda rights and speak with the officers, and he signed a Miranda waiver form.

At a joint trial with Morrison, Feeney was convicted of murder in the first degree, aggravated kidnapping, and conspiracy.  Morrison was convicted of manslaughter, aggravated kidnapping, and conspiracy.  Ricci entered into a plea agreement providing that, in exchange for testifying at his three codefendants' trials, he would plead guilty to aggravated kidnapping and conspiracy and would receive a sentence of eight years of incarceration.[4]

---

[4] As of this writing, Morrison's appeal remains pending before the Appeals Court, see Commonwealth vs. Morrison, No. 21-P-0699, and Feeney's appeal is pending before this court, see Commonwealth vs. Feeney, SJC-13163.

d.  Prior proceedings.  In February of 2016, a Superior Court judge, who was not the trial judge, denied the defendant's motion to dismiss.  The Commonwealth then moved in limine to exclude the defendant's August 6 statements to Tobin and Mattaliano.  The trial judge allowed the motion.

The defendant's trial on the charge of being an accessory before the fact to kidnapping took place over ten days.  His motions for required findings at the close of the Commonwealth's case, and again at the close of all the evidence, were denied.  The judge also declined to instruct on certain elements of the offense using the specific language the defendant requested.

The defendant was convicted and sentenced to from six to nine years in State prison.  His sentence was stayed pending his direct appeal.  The trial judge denied the defendant's motion to set aside the verdict and to enter a verdict of not guilty or to grant a new trial, and the defendant filed a second notice of appeal.  The defendant's motion to consolidate his appeals was allowed.  We subsequently allowed the defendant's application for direct appellate review.

2.  Discussion.  On appeal, the defendant argues that the Commonwealth failed to introduce sufficient evidence to prove that he was a knowing participant in the kidnapping and intended that it happen.  The defendant also argues that the judge's instructions on certain elements of the offense of being an

accomplice to kidnapping were erroneous and that the judge abused his discretion in excluding the defendant's statements to police concerning his knowledge of what Feeney intended to do with the items he borrowed.

a.  Sufficiency of the evidence.  The defendant's arguments as to why the evidence was insufficient focus on the lack of evidence of his knowledge of the planned kidnapping, and of his intent that it succeed.  The defendant contends that his unwitting assistance in lending the items to Feeney is insufficient to show that he acted knowingly with the specific intent of helping the kidnapping to succeed.  He notes that the nature of the police equipment lent does not, without more, prove his knowledge of the planned kidnapping or an intent to kidnap, as Feeney could have used the police equipment for numerous other (and much more ordinary) purposes, rather than to further a kidnapping.  Sustaining his conviction in the absence of direct evidence, the defendant argues, would require the jury to speculate about his knowledge and intent and be based primarily on character evidence.

"When reviewing a motion for a required finding of not guilty, the 'question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'" (emphasis in original).

Commonwealth v. Grassie, 476 Mass. 202, 207 (2017), S.C., 482 Mass. 1017 (2019), quoting Commonwealth v. Latimore, 378 Mass. 671, 677 (1979). "The relevant question is whether the evidence would permit a jury to find guilt [beyond a reasonable doubt], not whether the evidence requires such a finding." Commonwealth v. Brown, 401 Mass. 745, 747 (1988). Circumstantial evidence is competent to establish guilt beyond a reasonable doubt, Commonwealth v. Nadworny, 396 Mass. 342, 354 (1985), cert. denied, 477 U.S. 904 (1986), and the reasonable inferences drawn from such evidence "need not be necessary or inescapable," only "reasonable and possible" (citation omitted), Commonwealth v. Lao, 443 Mass. 770, 779 (2005), S.C., 450 Mass. 215 (2007) and 460 Mass. 12 (2011). At the same time, a conviction may not rest on the piling of inference upon inference or on conjecture and speculation. Id.

General Laws c. 274, § 2, the statute under which the defendant was convicted, provides that "[w]hoever aids in the commission of a felony, or is accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed, shall be punished in the manner provided for the punishment of the principal felon." Marshall v. Commonwealth, 463 Mass. 529, 536-537 (2012) (conduct that historically has been described as accessory before fact "plainly falls under the rubric of accomplice liability"). See Commonwealth v. Zanetti,

454 Mass. 449, 467 (2009) ("At its core, joint venture criminal liability has two essential elements:  that the defendant knowingly participated in the commission of the crime charged, and that the defendant had or shared the required criminal intent").  To establish intent for purposes of accessory liability, there must be "proof that the defendant 'consciously . . . act[ed] together [with the principals] before or during the crime with the intent of making the crime succeed'" (citation omitted).  Commonwealth v. Gonzalez, 475 Mass. 396, 414 (2016).  To sustain a conviction of kidnapping requires the Commonwealth to prove that the defendant "forcibly or secretly confine[d] or imprisone[d] another person . . . against his [or her] will" and "without lawful authority." G. L. c. 265, § 26.  Accordingly, to convict a defendant of being an accessory before the fact to kidnapping, the Commonwealth must prove that the defendant knowingly participated in the confinement of another person, forcibly and without lawful authority, and intended to do so.  See Commonwealth v. Fredette, 480 Mass. 75, 86 (2018).

"[A] person's knowledge or intent is a matter of fact which is often not susceptible of proof by direct evidence, so resort is frequently made to proof by inference from all the facts and circumstances developed at the trial."  Commonwealth v. Kilburn, 426 Mass. 31, 34 (1997), S.C., 438 Mass. 356 (2003), quoting

Commonwealth v. Stewart, 411 Mass. 345, 350 (1991). "Whether an inference is warranted or is impermissibly remote must be determined, not by hard and fast rules of law, but by experience and common sense." Kilburn, supra at 34-35, quoting Commonwealth v. Chay Giang, 402 Mass. 604, 609 (1988). Evidence of a conditional or contingent intent may be sufficient to uphold a conviction of being an accessory to a crime. See Commonwealth v. Richards, 363 Mass. 299, 308 (1973) (defendant provided guns that were intended for contingent use during course of robbery "if the need should arise").

Here, evidence was introduced concerning the defendant's and Feeney's interactions from which the jury could have found that the defendant was well aware of the mutual hostility between Feeney and the victim. There was evidence that the defendant and Feeney had a friendly, mutually beneficial relationship. The defendant regularly, and without question, provided Feeney with driving records of individuals against whom Feeney appeared to harbor animosity. The victim was arrested while he was attempting to break into Feeney's car, an incident that led Feeney to request that the defendant obtain the victim's BOP and driver's license records, using the defendant's access as a police officer. The jury also heard evidence that the defendant was aware of the "love triangle" between the victim, Feeney, and Morse, and also knew that Feeney was

"disturbed" by the victim, whom Feeney described as a "piece of shit."

Given the evidence of the defendant's knowledge of Feeney's animosity towards the victim, the jury could have inferred that, by providing Feeney with the police badge, handcuffs, and holster, the defendant was willing that the equipment be used unlawfully to confine another using force, if necessary. See Richards, 363 Mass. at 308 (to establish liability for being accessory before fact, "it would suffice if the purpose to [commit the crime] in the mind of the accessory was a conditional or contingent one, a willingness to see [the act] take place should it become necessary to effectuate [the motive underlying the offense or] "make good an escape").

The primary function of a police badge is to identify its holder as having lawful authority. See Commonwealth v. Gray, 423 Mass. 293, 296 (1996) ("Although the officer was not in uniform, the flashing strobe lights on an automobile being driven by a man displaying a badge gave the defendant sufficient notice that he was being stopped by a person with authority"). "Symbolizing the power of the [S]tate, a badge invests its possessor with control over people and access to places." United States v. Foreman, 926 F.2d 792, 795 (9th Cir. 1990). Here, the jury heard testimony by a State police trooper that his badge identified him as a police officer and gave him legal

authority.  See id. ("A police officer knows the power of [his] badge").

Moreover, the defendant had seen a number of guns, including a small black pistol, at Feeney's apartment.  See People v. Majors, 33 Cal. 4th 321, 331 (2004) (implicit threat of arrest satisfied force element of kidnapping, as defendant's conduct and his statements caused victim to believe that unless victim accompanied defendant, victim would be forced to do so). The jury would have been warranted in inferring that, in lending Feeney his police holster, the defendant intended that the holster would be used with one of Feeney's guns so as to impersonate an officer and intimidate the victim.  See Commonwealth v. Lewis, 465 Mass. 119, 126 (2013) (presence of gun may imply intent to frighten and deter); Commonwealth v. Stout, 356 Mass. 237, 240 (1969) ("One does not transmit guns to others without some purpose in mind . . .").

In the context of the offense of kidnapping, we have interpreted the term "confinement" to mean "[a]ny restraint of a person's liberty."  Commonwealth v. Witkowski, 487 Mass. 675, 682 (2021), quoting Commonwealth v. Dykens, 438 Mass. 827, 841 (2003).  See Commonwealth v. Oberle, 476 Mass. 539, 548 (2017) (confinement is "broadly interpreted to mean any restraint of a person's movement" [citation omitted]).  Handcuffs are "one of the most recognizable indicia of a traditional arrest."  See

United States v. Acosta-Colon, 157 F.3d 9, 18 (1st Cir. 1998). See also Fisher v. Las Cruces, 584 F.3d 888, 897 (10th Cir. 2009). "Common sense and experience teach that it is a normal and regular as well as a highly desirable and necessary practice to handcuff prisoners when they are being taken from one place to another" (quotation and citation omitted). See E.W. v. Dolgos, 884 F.3d 172, 193 (4th Cir. 2018) (Shedd, J., concurring). While not indisputable, the jury's inferences here were rational. Our review is limited to determining whether the loan of the handcuffs, taken together with the badge, the holster, and the victim's BOP records and driver's license information, provided sufficient evidence to support a finding that the defendant intended the handcuffs be used to confine another. See Winding v. State, 908 So. 2d 163, 171 (Miss. Ct. App. 2005) (evidence of handcuffs was probative of testimony that defendant masqueraded as police officer in order to kidnap). We conclude that it did.

The defendant lent the police equipment to Feeney within a few months of the victim's attempted break-in of Feeney's vehicle and less than one month after the defendant's having obtained the victim's BOP records. Moreover, the defendant lent Feeney the police equipment soon after Feeney gave him free Percocet pills. Where Feeney said that he "just want[ed] to use [the items]," the jury reasonably could have concluded, from the

nature of the police equipment and Feeney's demonstrated hostility to the victim, that the defendant provided those items with a willingness that Feeney use them to restrain, unlawfully and with force, a person he was targeting (as indicated by the request for the victim's BOP and RMV records).  See Commonwealth v. Noble, 417 Mass. 341, 346 (1994) (circumstantial evidence was sufficient to show that defendant knew of perpetrator's intent to seek revenge against victim, and aided perpetrator's plan by providing disguise).

We have limited the drawing of inferences concerning a defendant's knowledge of a codefendant's knowledge and intent, based on the nature of certain objects, to a narrow set of circumstances.  For instance, we have concluded that a jury reasonably could have drawn an inference that a defendant knew that a coventurer was armed, because the victim was a known drug dealer who kept an unlicensed gun on the premises.  See Commonwealth v. Cannon, 449 Mass. 462, 470-471 (2007).  We have affirmed a conviction that rested on a conclusion that a defendant intended a robbery, and did not simply purchase illegal drugs, where the defendant proposed a plan for the robbery and provided his codefendant with a gun.  See Commonwealth v. Benitez, 464 Mass. 686, 690 (2013).

Not infrequently, we have concluded that the evidence was sufficient to sustain a conviction where the jury found that a

defendant intended to distribute illegal drugs, because the drugs were present on the defendant's person, as were significant amounts of cash, baggies, and multiple cell phones. See, e.g., Commonwealth v. Gonzalez, 452 Mass. 142, 147-149 (2008). We also have concluded that the provision of accelerants, such as gasoline, in conjunction with other evidence, may permit an inference that a defendant had the requisite intent to commit arson. See Commonwealth v. Dung Van Tran, 463 Mass. 8, 27 (2012) (evidence that defendant carried can of gasoline into apartment, poured it on floor, and then ignited it supported inference of intent to burn apartment); Choy v. Commonwealth, 456 Mass. 146, 150 (2010) (gasoline on defendant's sweatpants supported finding that fire was intentionally set). By extension, the jury reasonably could have drawn such an inference here, given the specific crime of kidnapping, the defendant's knowledge of Feeney's hostility toward the victim, and the combination of the particular items provided by the defendant.

"There is a presumption that all men intend the natural and probable consequences of their acts." Commonwealth v. Asherowski, 196 Mass. 342, 348 (1907). While not the only reasonable conclusion that could be drawn from this evidence, the jury could have found the existence of a tacit understanding on the part of the defendant that he was providing the requested

items to Feeney with the contingent intent that they be used as Feeney saw fit, and that the defendant did so in order to maintain access to Feeney's supply of Percocet pills. "The line that separates mere knowledge of unlawful conduct and participation in it, is 'often vague and uncertain. It is within the province of the jury to determine from the evidence whether a particular defendant [has] crossed that line.'" Commonwealth v. Longo, 402 Mass. 482, 487 (1988), quoting Commonwealth v. Cerveny, 387 Mass. 280, 287 (1982). See Richards, 363 Mass. at 308. In determining whether the evidence was sufficient to show that the defendant harbored such a contingent intent, we do not reweigh the evidence in order to decide whether the determination that the jury reached is correct. Rather, after considering the evidence and the inferences to be drawn therefrom in the light most favorable to the Commonwealth, we decide only whether the jury made a rational decision based on the evidence before them. See Latimore, 378 Mass. at 677-678.

b. Jury instructions. The defendant also contends that several of the judge's instructions on the elements of the offense were erroneous and require a new trial.

i. Instruction on element of participation. The defendant argues that the judge erred in describing "assistance," "aid," and "encouragement" as relevant conduct for the charge of

accessory before the fact.  This alleged error improperly expanded the scope of the crime to include acts that are encompassed only in the crime of aiding and abetting, for which the defendant was not indicted.  The defendant also maintains that the improper instruction allowed the jury to find guilt without finding the required element of knowing participation.

The defendant submitted proposed jury instructions, including the following proposed language on the element of participation:

> "To prove the defendant guilty of being an accessory before the fact to a felony, the Commonwealth must prove three things beyond a reasonable doubt . . . .  Second:  That the defendant was an accessory to that felony by counseling, hiring, or otherwise procuring that person to commit the felony . . . .  [T]he Commonwealth must prove that this defendant participated in . . . committing the offense by counseling, hiring, or otherwise procuring the principal, or agreeing to stand by, at or near the scene to render aid, assistance and encouragement. . . .  A conviction as an accessory before the fact requires not only knowledge of the crime and a shared intent to bring it about, but also some sort of act that contributes to its happening."

The portion of the judge's instruction on participation that the defendant contested stated:

> "To prove that [the defendant] is guilty of the crime of accessory before the fact to kidnapping, the Commonwealth must prove three things beyond a reasonable doubt. . . . Second, that [the defendant] in some way assisted in that felony by hiring or procuring it to be committed or by providing counseling, assistance, aid of some sort or encouragement before the felony was actually committed. Third, that [the defendant] not only had knowledge of the crime, but shared [Feeney's] intent to bring it about."

Because the defendant objected, we review for prejudicial error. See Commonwealth v. Teixeira, 490 Mass. 733, 742 (2022). Thus, we analyze, first, whether there was error, and second, if so, whether the defendant was prejudiced by the error. Id., citing Commonwealth v. Cruz, 445 Mass. 589, 591 (2005). "An error is not prejudicial if it did not influence the jury, or had but very slight effect; however, if we cannot find with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantiality swayed by the error, then it is prejudicial." Teixeira, supra, quoting Cruz, supra.

In Marshall, 463 Mass. at 535, quoting Zanetti, 454 Mass. at 464, we held that the two prongs established under G. L. c. 274, § 2,[5] are a "false distinction[]," and instead endorsed a long-standing "unified theory of joint venture liability." Marshall, supra at 537 n.12. As the language of the instruction set forth in Zanetti recognizes, "a wide range of conduct underlying a person's liability for a criminal offense, including that which had historically been described as accessory before the fact to a felony or aiding and abetting a

---

[5] As stated, G. L. c. 274, § 2, provides that "[w]hoever aids in the commission of a felony, or is accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed, shall be punished in the manner provided for the punishment of the principal felon."

felony, plainly falls under the rubric of accomplice liability."
Marshall, supra at 536-537.

Thus, the actions of one who "aids" in the commission of an
offense and the actions of "accessories before the fact" do not
constitute "separate and distinct offenses," Commonwealth v.
Rodriguez, 457 Mass. 461, 485 (2010), but, rather, represent
different routes to a determination of criminal liability for a
defendant who knowingly participates in a crime, see Marshall,
463 Mass. at 535 ("prosecut[ing] on a theory of aiding and
abetting . . . is not a lesser included offense of accessory
before the fact . . . . Rather, the two are different species
of the same crime"). The types of conduct specified in G. L.
c. 274, § 2 -- "aid[ing] in the commission of a felony" or
"counselling, hiring or otherwise procuring such felony to be
committed" -- represent equal and interchangeable grounds for
criminal liability to the extent that such actions constitute
"knowing participation," Marshall, supra, that is "significant,"
Commonwealth v. Ortiz, 424 Mass. 853, 856 (1997), quoting
Commonwealth v. Raposo, 413 Mass. 182, 185 (1992).

Given our continued endorsement of a unified theory of
joint venture liability, the judge did not err in referring to
the provision of "assistance," "aid," and "encouragement" as
relevant conduct to establish the offense of being an accessory
before the fact. The "practical framework" of our doctrine of

accomplice liability is "grounded in its 'essential elements' of knowing participation and shared criminal intent." Marshall, 463 Mass. at 535, quoting Zanetti, 454 Mass. at 467. Although the defendant is correct that "aid[ing]" is a different act from "procuring" or "counselling," the jury would have found the defendant to bear the same criminal liability if the defendant undertook any of these actions. In its entirety, the judge's instruction adequately conveyed that the defendant had to have been a knowing participant in Feeney's crimes. There was no error in the judge's decision not to adopt the requested instruction, as "judges are not required to deliver their instructions in any particular form of words" (citation omitted). See Commonwealth v. Howard, 479 Mass. 52, 61 (2018).

ii. Instructions on elements of knowledge and intent. The defendant also argues that the judge did not instruct adequately on the elements of knowledge and intent in the offense of accessory before the fact to kidnapping. The defendant submitted requested instructions on these elements, but the judge declined to use the specific requested language.

As an initial matter, while the defendant asserts that he objected to the judge's instructions on these elements, the transcripts do not support this contention. The instruction the defendant proposed described knowledge and intent as one element:

> "Thirdly, the Commonwealth must prove that the defendant
> had the same intent that the principal person is required
> to have had to be found guilty.  The defendant must not
> only have had knowledge of what was being planned; he must
> have intended to be part of it."

In raising the issue immediately prior to the jury charge, defense counsel maintained that "a conviction as an accessory before the fact requires not only . . . knowledge of the crime and a shared intent to bring it about but also some sort of act that constitutes it's happening and [a] non-present joint venturer must intentionally encourage or assist in the commission of a crime."  In support, counsel pointed to Commonwealth v. Reveron, 75 Mass. App. Ct. 354, 357 (2009).  As the defendant asserts, the instructions that the judge ultimately provided used "different language" from what the defendant had requested.  Nonetheless, the proposed language was substantially similar to the language the judge used.  And, importantly, the defendant's objection at trial did not concern the adequacy of the judge's instructions on knowledge and intent.  Accordingly, we review for a substantial risk of a miscarriage of justice.  See Commonwealth v. Ortiz, 487 Mass. 602, 611 (2021).  A substantial risk of a miscarriage of justice exists if we have serious doubt whether the result of the trial might have been different had the error not been made.  Id. at 612, citing Commonwealth v. Azar, 435 Mass. 675, 687 (2002), S.C., 444 Mass. 72 (2005).

The defendant asserts that there were several errors in the instructions on knowledge and intent. First, the defendant argues that the judge's instructions gave rise to a substantial risk of a miscarriage of justice because the judge did not provide explicit instructions on the element of knowledge, as required by Zanetti, 454 Mass. at 464, 467.

The judge instructed on the element of knowledge as follows:

> "[T]o prove that [the defendant] is guilty of the crime of accessory before the fact to kidnapping, the Commonwealth must prove three things beyond a reasonable doubt. . . . Third, that [the defendant] not only had knowledge of the crime, but shared [Feeney's] intent to bring it about."

Shortly thereafter, the judge substantially repeated this instruction when he explained, "Now, I said the third thing that the Commonwealth must show is that [the defendant] not only had knowledge of the crime but shared [Feeney's] intent to bring it about." At that point, the judge did not give any further explanation on the element of knowledge.

During deliberations, the jury asked the judge to clarify the element of knowledge "in layman's language." After conferring with counsel, the judge informed the jury:

> "'Knowledge' and 'Intent' are two separate requirements. Knowledge is an awareness or understanding of a fact or circumstance. In this case, the Commonwealth is required to prove beyond a reasonable doubt that [the defendant] knew, at the time he provided assistance to Feeney, [if you find that he did] that he had knowledge that Feeney intended a kidnapping. The Commonwealth is not required to

prove that Feeney told [the defendant] what his intentions were, but it is required to prove that [the defendant] understood that Feeney intended a kidnapping. Knowledge can be proven by direct evidence, or circumstantial evidence. As with intent, you may, but are not required, to determine the defendant's knowledge from his conduct, including any statement or act committed or omitted, and the reasonable inferences you may draw from them. You should consider all of the surrounding facts and circumstances, and weigh them in light of your common knowledge and experience, in order to determine whether or not to draw the inference that [the defendant] knew that [Feeney] intended a kidnapping."

Although the judge's initial instruction on knowledge was brief, it adequately conveyed the critical information. As discussed, to support a finding of joint venture criminal liability, a defendant must "knowingly participate[]" in the underlying offense. See Marshall, 463 Mass. at 535, quoting Zanetti, 454 Mass. at 468. The judge's initial instruction adequately conveyed this concept by explaining that the Commonwealth had to prove that the defendant "had knowledge of the crime," thus amounting to "knowing participation." Moreover, the judge thereafter clarified his initial instruction by distinguishing the element of knowledge from intent and defining knowledge as "an awareness or understanding of a fact or circumstance." See Ortiz, 487 Mass. at 612 (we consider instructions "as a whole in the context of the totality of the evidence and interpret the instructions as would a reasonable juror" [quotations and citations omitted]). Although the defendant maintains that the judge should have provided more

detailed guidance or examples of participation, the judge was not required to do so.[6] And, as stated, there was no error in the judge's decision not to use the precise language the defendant suggested, as we do not require a judge to use any particular language, even if so requested by a defendant. Commonwealth v. Kelly, 470 Mass. 682, 697 (2015).

The defendant also argues that the judge improperly referenced "trickery," with respect to kidnapping by trickery, in describing the underlying crime that the jury were required to find before the defendant could be convicted of being an accessory before the fact to that offense. Because kidnapping by trickery is a specific intent crime, and not a general intent crime like kidnapping, the defendant contends that the instruction likely confused the jury.

The judge first described the elements of kidnapping with respect to the charges against Feeney. In order to convict the defendant of being an accessory, he then explained, the jury first would have to find that Feeney committed the underlying offense of kidnapping. When instructing on the second element

---

[6] The defendant asserts that the judge was required to instruct that the Commonwealth had to prove that the defendant knew there was a "substantial likelihood that [Feeney] would [kidnap the victim]." See Kilburn, 426 Mass. at 34, citing Commonwealth v. Walsh, 407 Mass. 740, 743 (1990). Such an instruction would have been an incorrect statement of law and would have reduced the Commonwealth's burden of proof from knowing participation.

of kidnapping, i.e., that the Commonwealth was required to prove that Feeney forcibly seized and confined the victim, the judge explained, "Against the alleged victim's will means without the alleged victim's consent.  Consent must be voluntary.  If an alleged victim is tricked into submitting to a defendant by a pretense of lawful authority[,] that is not consent."  The defendant did not object to the language the judge employed. Rather, the defendant offered to stipulate that a kidnapping had taken place and suggested that the judge omit the detailed instruction concerning the elements of kidnapping that the Commonwealth was required to prove.

The judge properly instructed the jury that the Commonwealth had to show that the defendant "shared [Feeney's] intent to bring [the kidnapping] about.  The intent to commit kidnapping is the intent to confine or imprison another person against his will."  The defendant repeatedly offered to concede that a kidnapping had occurred, in his opening statement, his motion for a required finding, and in the final charge conference.  The evidence that the victim had been kidnapped was overwhelming; while the reference to trickery was not required, the entirety of the charge accurately conveyed what the jury had to find concerning the defendant's intent.  To the extent that the jury misinterpreted the type of intent they were required to find for the crime with which the defendant had been charged,

the reference to kidnapping by trickery would not have created a substantial risk of a miscarriage of justice, as the specific intent of kidnapping by trickery requires a standard of intent with a higher burden than the general intent to kidnap. See Commonwealth v. Pfeiffer, 482 Mass. 110, 128-130, cert. denied, 140 S. Ct. 498 (2019) (jury instruction on specific intent was error, but it skewed in favor of defendant).

The defendant also maintains that, in instructing on contingent intent, the judge impermissibly reduced the Commonwealth's burden to prove the element of intent beyond a reasonable doubt. In his final charge, the judge told the jury that the intent to commit kidnapping is the intent to confine or imprison another person against the individual's will and that this requirement is satisfied "even if the purpose to kidnap in [the defendant's] mind was simply a conditional or contingent one, a willingness to see the kidnapping take place should it become necessary."

This instruction did not give rise to a substantial risk of a miscarriage of justice. It was an accurate statement of law and applicable to the case at hand. See, e.g., Commonwealth v. Hanright, 466 Mass. 303, 312 (2013), quoting Richards, 363 Mass. at 308 (in accessory before fact prosecution, "it would suffice if the purpose [to the crime] . . . in the mind of the accessory was a conditional or contingent one, a willingness to see [a

crime] take place should it become necessary"). See also Commonwealth v. Brea, 488 Mass. 150, 167 (2021). Contingent intent is not limited to situations where the underlying crime identified in the indictment differs from the original criminal plan, as the defendant suggests.

As stated, in reviewing a judge's instruction for error, we review the final charge as a whole, in the context of the totality of the instructions given, and interpret the instructions as would a reasonable juror. See Ortiz, 487 Mass. at 612; Conners v. Northeast Hosp. Corp., 439 Mass. 469, 481 (2003). Trial judges have considerable discretion in framing jury instructions, both in determining the precise language to be used and in the appropriate degree of elaboration. See Ortiz, supra. "The adequacy of instructions must be determined in light of their over-all impact on the jury." Id., quoting Commonwealth v. Blanchett, 409 Mass. 99, 103 (1991). Given that the instruction adequately conveyed to the jury the requisite legal components of the three elements of the offense with which the defendant was charged, we discern no error in the judge's instructions.

c. Exclusion of defendant's statements. The defendant argues that the judge abused his discretion in excluding certain of the defendant's statements to Tobin and Mattaliano. The defendant was interviewed by Tobin and Mattaliano on July 24,

2014, immediately prior to his grand jury testimony concerning the victim's disappearance. The defendant was interviewed again on August 6, 2014, after a warrant for his arrest had been issued. Before both interviews, the defendant was read the Miranda warnings and signed a Miranda waiver form.

During the August 6 conversation, the defendant told Tobin, "If I knew they were gonna do somethin' like this, I, I wouldn't have done all that, obviously." Mattaliano then asked, "Well, what did you think was gonna happen when you gave [the police equipment] to [Feeney]?" to which the defendant answered:

> "I, I don't know, if this guy's gonna play a joke on his buddy or what, what, how he got it out of me, you know. I, I didn't think [Feeney] was gonna kidnap a guy. I really didn't. . . . I swear to God I had no idea he was gonna kidnap, no idea."

Later, Mattaliano again asked the defendant, "[W]hat did you think [Feeney] was using everything for?" The defendant responded, "I don't know. . . . I thought he was playin' a joke on a friend of his or something like that."[7]

The Commonwealth filed a motion in limine to exclude the entirety of the defendant's August 6 interview as hearsay. At a hearing on the motion, the discussion focused on whether the August 6 statements were admissible under the doctrine of verbal

---

[7] The record contains no audio or video recording of either the July 24 interview or the August 6 interview. See Commonwealth v. DiGiambattista, 442 Mass. 423, 425 (2004).

completeness. See Mass. G. Evid. § 106 (2022). Citing Mass. G. Evid. § 106, the judge allowed the motion. At trial, Tobin testified that, in the July 24 interview, he asked the defendant what he believed Feeney was going to do with the items and the defendant responded that he "didn't want to know." The defendant impeached Tobin with his police report memorializing the interview, which did not indicate that the defendant had made such a statement. The defendant also attempted to impeach Tobin with the August 6 statements; the defendant argued that, through his testimony, Tobin had opened the door to their admission. The judge did not agree that Tobin's testimony had opened the door and again ruled that the statements were inadmissible.

On appeal, the defendant maintains that the statements should have been admitted. He contends that the statements were not hearsay but, rather, were probative of the defendant's state of mind and intent. Alternatively, the defendant argues that the statements should have been admissible under the doctrine of verbal completeness. The defendant also argues that the judge should have permitted introduction of the statements in order for the defendant to impeach Tobin once Tobin opened the door to the topic of the defendant's knowledge of the use Feeney would make of the items.

We conclude that there was no abuse of discretion in the decision to exclude these statements. See Commonwealth v. Andre, 484 Mass. 403, 414 (2020). "[A] defendant's statement, when offered by the defendant to prove the truth of the statement's contents, is inadmissible hearsay." Commonwealth v. Eugene, 438 Mass. 343, 350 (2003). An out-of-court statement may be admissible as nonhearsay if it is relevant to show the speaker's state of mind in a manner separate and apart from the truth of the statement. See Commonwealth v. Siny Van Tran, 460 Mass. 535, 550-551 (2011); Mass. G. Evid. § 801 note. However, "[w]here the declarant asserts his or her own state of mind (usually by words describing the state of mind), the statement is hearsay and is admissible only if it falls within the [then-existing state of mind] hearsay exception." Commonwealth v. Yat Fung Ng, 491 Mass. 247, 259 (2023), quoting Mass. G. Evid. § 801 note, Evidence Admitted for Nonhearsay Purpose.

Here, the defendant's August 6 statements were not admissible as nonhearsay state of mind. Those statements directly described the defendant's state of mind, i.e., that at the time the defendant provided the items to Feeney, he did not know for what purpose Feeney would use them. As such, the statements were hearsay. See Yat Fung Ng, 491 Mass. at 259.

Nor did the August 6 statements qualify under the state of mind exception to the hearsay rule. Statements "purporting to

explain past conduct" are not admissible under this exception. See id. at 260, quoting Commonwealth v. Bianchi, 435 Mass. 316, 327 (2001); Mass. G. Evid. § 803(3)(B)(ii). The August 6 statements sought to explain the defendant's prior actions, i.e., why he gave the items to Feeney. "Statements of memory or belief to prove the fact remembered or believed do not fall within this exception." Mass. G. Evid. § 803(3)(B)(ii). As such, the August 6 statements were properly excluded here.

Nor were the statements admissible under the doctrine of verbal completeness. Under that doctrine, when a party introduces a portion of a statement, "a judge has discretion to allow admission of other relevant portions of the same statement or writing which serve to clarify the context of the admitted portion." Commonwealth v. Amaral, 482 Mass. 496, 503-504 (2019), quoting Commonwealth v. Crayton, 470 Mass. 228, 246 (2014). For a statement to be admissible under this doctrine, an adverse party must show that the additional statements concern the same subject as the admitted statement, are part of the same conversation, and are necessary to the understanding of the admitted statement. Amaral, supra at 504, quoting Crayton, supra at 247. To be admissible, "[t]he proffered statement must meet each component of the doctrine of verbal completeness." Amaral, supra.

The defendant's August 6 statements were not part of the "same conversation" as those on July 24.  The two conversations were "temporally separate."  See Commonwealth v. Steeves, 490 Mass. 270, 278 (2022) (statements approximately two hours apart were sufficiently distinct so as not to form part of same conversation).  The August 6 conversation took place after a warrant had been issued for the defendant's arrest.  This change of circumstances further bifurcated the August interview from the one in July.  When speaking to Tobin and Mattaliano on August 6, the defendant thought that he "already [had]" spoken to them and wanted to know if there were additional subjects to discuss.[8]  Because the proffered statement was not part of the same conversation as the admitted statement, the judge did not abuse his discretion by ordering it excluded.

Finally, the judge did not abuse his discretion in concluding that Tobin's testimony at trial did not open the door to the admission of the defendant's August 6 statements.  An out-of-court statement introduced to impeach a witness, and not to prove the truth of the matter asserted, is not hearsay.  See

---

[8] The cases that the defendant cites in support of the admissibility of the statement on the doctrine of verbal completeness are inapposite.  See Commonwealth v. Condon, 99 Mass. App. Ct. 27, 36 (2020) (considering text messages sent throughout one day); Commonwealth v. Gilman, 89 Mass. App. Ct. 752, 759-760 & n.9 (2016) (defendant did not claim that admitted social media messages were so misleading as to implicate doctrine of verbal completeness).

Commonwealth v. Denson, 489 Mass. 138, 149 (2022), citing Commonwealth v. Niemic, 483 Mass. 571, 581 (2019).  A trial judge has discretion to determine the scope of cross-examination, including the value, if any, of prior inconsistent statements offered to impeach a witness.  See Commonwealth v. Caruso, 476 Mass. 275, 296 (2017).  Where impeachment evidence is cumulative, courts generally reject the argument that the evidence is material, so long as the defendant had adequate opportunity to impeach the witness by other means.  See Commonwealth v. Holbrook, 482 Mass. 596, 610-611 (2019), citing Commonwealth v. Fuller, 394 Mass. 251, 264 (1985), S.C., 419 Mass. 1002 (1994).

Tobin testified that, on July 24, the defendant told him that the defendant "didn't want to know what" Feeney's purposes were in requesting the loan of the police equipment.  The defendant impeached this testimony by questioning Tobin about his written report, which did not contain the defendant's statement that he "didn't want to know."  Evidence of the defendant's later, contradictory statement on August 6 thus would not have impeached Tobin's earlier testimony.  There was no abuse of discretion in the judge's determination that the August 6 statements were not pertinent for impeachment purposes and that the defendant instead was attempting to introduce them for the impermissible purpose of their purported truth.

3.  <u>Conclusion</u>.  We affirm the defendant's conviction and the order denying his motion for postconviction relief.

<u>So ordered</u>.